# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ORLANDO CORDIA HALL
Register Number 26176-077
U.S. Penitentiary Terre Haute
Terre Haute, IN 47802

*Plaintiff*,

v.

WILLIAM P. BARR, in his official
capacity as U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530;

MICHAEL CARVAJAL, in his official
capacity as Director of the Federal Bureau of
Prisons
U.S. Department of Justice
320 First Street, NW
Washington, DC 20534;

BARB VON BLANCKENSEE, in her official
capacity as Regional Director of the North
Central Region, Federal Bureau of Prisons
U.S. Department of Justice
400 State Avenue, Suite 800
Kansas City, KS 66101;

T.J. WATSON, in his official
capacity as Complex Warden of U.S.
Penitentiary Terre Haute
4700 Bureau Road South
Terre Haute, IN 47802;

DONALD W. WASHINGTON, in his official
capacity as Director of the U.S. Marshals
Service
1215 Clark Street
Arlington, VA 22202

*Defendants*.

No.  1:20-cv-3184

**Death Penalty Case**

**Execution Date:
November 19, 2020**

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

## INTRODUCTION

1.      Plaintiff Orlando Cordia Hall ("Mr. Hall") is under a sentence of death, and his execution is scheduled to go forward in a matter of weeks, most impractically, amid a global pandemic.   Executing Mr. Hall under the present circumstances risks denying him basic protections guaranteed by the Constitution and by statute, while also risking the health and safety of his attorneys, prison personnel, Mr. Hall's family members, family members of the victim, and others in attendance.   The decision to schedule Mr. Hall for execution in the midst of the country's ongoing struggle with the COVID-19 pandemic—and on an accelerated schedule, no less—is plainly unjustified and forces Mr. Hall's attorneys to choose between protecting the health and safety of themselves and their immediate families, or vindicating their death-sentenced client's rights to meaningful representation in the days and weeks prior to the execution.   That is a cruel and avoidable dilemma.   Through this Complaint, Mr. Hall does not seek any direct relief from his conviction or sentence.   All he asks is that he be afforded the process and other rights that the Constitution and federal law guarantee him, and which the government is denying him in its race to the execution chamber amid unprecedented circumstances.   Mr. Hall's rights can be protected.   Doing so simply requires that Mr. Hall's planned execution, like so many other events that it has been necessary to postpone in this country due to the threat from the greatest public health emergency of the last hundred years, be put on hold for the time being.

2.      Not only has Mr. Hall's execution been scheduled in the midst of an unprecedented and still-accelerating global pandemic, it also has been scheduled with the shortest period of notice from the Federal Bureau of Prisons ("BOP") in the history of the

modern federal death penalty.[1]   For more than thirteen years, Mr. Hall was protected by an injunction barring his execution.  That injunction was lifted on September 20, 2020.  Just ten days later—on September 30, 2020—Mr. Hall received notice he would be executed in just 50 days, on November 19.  This is unprecedented.  From at least 2004 until July 2020, the BOP's own internal protocols required the BOP to provide at least 90 days of notice.  And in practice, the BOP typically provided much more than 90 days of notice.  But then, on July 31, 2020, the BOP issued a new protocol allowing the government to provide as little as 50 days' notice to an execution, while giving the warden discretion to provide even less notice.  The BOP immediately took advantage of this policy in setting an execution date for Mr. Hall.

3.     The dramatically abbreviated notice and the ongoing COVID-19 pandemic make it impossible for Mr. Hall to   prepare an adequate case for clemency with the assistance of counsel as guaranteed by federal law and also violate his right to due process in clemency proceedings.  Additionally, applying the newly minted abbreviated notice policy violates the *Ex Post Facto* Clause of the United States Constitution.   Finally, the BOP has acted beyond its authority in supervising the implementation of Mr. Hall's federal death sentence—a role Congress expressly delegated to the United States Marshals Service—in violation of the Federal Death Penalty Act.

4.     Mr. Hall brings this action against William P. Barr, in his official capacity as U.S. Attorney General; Michael Carvajal, in his official capacity as Director of the Federal Bureau of Prisons; Barb von Blanckensee, in her official capacity as Regional Director of the North Central

---

[1] Since 2001, the BOP has issued a shorter notice period while *rescheduling* executions, however, between January 2001 and August 2020, it provided notices of no less than 120 days for an initial execution date.  This initial notice period is crucial to the guarantee of a full and adequate clemency process, the lack of which is the basis for Mr. Hall's Complaint.

Region, Federal Bureau of Prisons; T.J. Watson, in his official capacity as Warden of the Federal Correctional Complex in Terre Haute, Indiana, which includes the United States Penitentiary where Mr. Hall resides; and Donald W. Washington, in his official capacity as Director of the U.S. Marshals Service (collectively, "Defendants"). Mr. Hall seeks injunctive and declaratory relief for: (a) violations and threatened violations of his right to due process under the Fifth Amendment of the U.S. Constitution; (b) violations and threatened violations of his rights of access to counsel and the courts under the Fifth and Sixth Amendments of the U.S. Constitution, as well as those provided under 18 U.S.C. § 3599; (c) the imposition of greater punishment in violation of the *Ex Post Facto* Clause of the Constitution; and (d) violations and threatened violations of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA").

## BACKGROUND

5.     In October 1994, the government commenced criminal proceedings against Mr. Hall and, ultimately, four co-defendants. Mr. Hall was convicted on October 31, 1995 for kidnapping in which a death occurred, conspiracy to commit kidnapping, traveling in interstate commerce to promote possession of marijuana with intent to distribute, and using and carrying a firearm during a crime of violence. Following his conviction, Mr. Hall was sentenced to death pursuant to the Federal Death Penalty Act of 1994, 18 U.S.C. § 3591 *et seq*. ("FDPA"). Only one of Mr. Hall's co-defendants also received a sentence of death (and that death sentence was later vacated). Mr. Hall appealed his conviction and sentence, and later sought vacatur through 28 U.S.C. § 2255. All his requests were denied.

6.     In 2007, after his petition for writ of certiorari from the denial of his § 2255 motion was denied, Mr. Hall intervened in a case before this Court challenging the lethal injection protocol employed under the federal death penalty regime. Unopposed Mot. to

Intervene as Pl., *Roane v. Gonzales*, No. 1:05-cv-02337-TSC (D.D.C. Apr. 27, 2007), ECF No. 38. As part of that litigation, the Court ordered a preliminary injunction, to which the government consented, barring the execution of several plaintiffs in that action, including Mr. Hall. Order, *Roane v. Gonzales*, No. 1:05-cv-02337-TSC (June 11, 2007), ECF No. 68. That injunction continued for the next thirteen years, primarily because once its three-drug protocol became unavailable, the federal government stalled in developing an alternate method of execution. The claims of multiple federal death row prisoners were later consolidated into a single action, as further described below. *In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-00145-TSC (D.D.C. Aug. 20, 2019).

7.   On July 25, 2019, the United States Department of Justice ("DOJ") announced that executions of federal prisoners would be administered by the BOP using a revised addendum to the BOP Execution Protocol (the "2019 Addendum") released the same day.

8.   On November 13, 2019, the DOJ publicly filed the Administrative Record, which included a revised BOP Execution Protocol that replaced the prior version. (The new BOP Execution Protocol announced by the DOJ and the 2019 Addendum are referred to herein collectively as the "2019 Protocol").

9.   On August 20, 2019, numerous challenges to the constitutionality of the 2019 Addendum were consolidated in the District of Columbia District Court. *In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, 1:19-mc-00145-TSC (D.D.C. Aug. 15, 2019), ECF No. 1. In November 2019, the court enjoined the scheduled executions of four prisoners, the first of which was at that time scheduled to take place the following month, in December 2019. *Id.* at ECF No. 50 at 15. In April 2020, a divided panel of the United States Court of Appeals for the D.C. Circuit vacated the injunction and remanded the case back to the

district court.  *FBOP Execution Protocol Cases*, 19-05322 (D.C. Cir. 2020).  On June 15, the government notified the district court that the four previously-scheduled execution dates had been rescheduled.  *In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, 1:19-mc-00145-TSC (D.D.C June 15, 2020), ECF No. 99.  On July 13, the district court once again enjoined the government's scheduled executions—one of which was scheduled to take place that same day.  *Id.* at ECF No. 135.  The Supreme Court vacated this second injunction at 2:00 am the following morning.  And though the execution date had passed and the execution warrant for Mr. Lee had expired, the government executed Mr. Lee several hours later.  The government executed two more individuals—Wesley Purkey and Dustin Honken—later that week.

10.     On July 31, 2020, the BOP issued an Addendum to the Federal Execution Protocol (the "2020 Addendum"), effective that day, which amended the notice provision to provide that the warden "will" notify the inmate at least 50 days in advance of the execution date, but, at his discretion, may provide as little as 20 days' notice.

11.     Meanwhile, the contagious respiratory disease caused by SARS-CoV-2 ("COVID-19") spread throughout the United States and the world, causing a global pandemic that has killed more than 1.2 million people (and more than 230,000 Americans).  John Hopkins Univ. & Med., *COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSEE) at John Hopkins University and Medicine* (last visited Nov. 2, 2020).  The virus threatens the health and safety of anyone—including prisoners in the federal prison system—who contracts the virus or comes into contact with those who have been exposed.  While the pandemic has presented innumerable and diverse challenges throughout society, Mr. Hall has been acutely impacted by the attendant restrictions as Defendants have scheduled him for

execution even as the pandemic rages.  In particular, scheduling Mr. Hall's execution in these circumstances deprives him of the right to meaningful legal representation before his execution provided by 18 U.S.C. § 3599(e), including by preventing Mr. Hall's attorneys from adequately investigating and pursuing his right to participate in clemency proceedings and exploring further judicial avenues of relief, such as a successive petition under 28 U.S.C. § 2255.

12.    As of November 3, 2020, the pandemic is continuing to ravage the United States. Indeed, the United States is currently experiencing a dramatic surge in COVID-19 cases that makes it unacceptably dangerous for Mr. Hall's attorneys to travel to locations where witnesses critical to his ability to prepare his case for clemency (including Mr. Hall himself) reside.  Such travel is essential to Mr. Hall's ability to seek clemency because in-person interviews with those witnesses are indispensable to completing Mr. Hall's clemency submissions.    These circumstances, combined with counsels' personal and familial health risks and the only 50 days' notice provided of Mr. Hall's scheduled execution date, have prevented Mr. Hall's attorneys from investigating, developing, and preparing a current and complete clemency request (or exploring further avenues of judicial relief). Were Mr. Hall's execution scheduled to proceed at any time other than during the global COVID-19 pandemic, there is no question that the representation he would receive, and is statutorily guaranteed when an execution date has been set, would be qualitatively better and more likely to result in the possibility of mercy.

13.    Nevertheless, Defendants have proceeded apace to schedule Mr. Hall's execution, disregarding these unique circumstances and Mr. Hall's rights, as alleged herein.  Upon the government's motion, the injunction barring Mr. Hall's execution was vacated by the district court on September 20.  And, on September 30, at Attorney General Barr's direction, the BOP noticed Mr. Hall's execution.  Ex. 1, Notice of Execution.

14.     Mr. Hall's execution is scheduled to take place at the U.S. Penitentiary in Terre Haute, Indiana ("USP Terre Haute") on November 19, 2020.  *Id.*

15.     The immediacy of Mr. Hall's execution date, combined with the circumstances presented by the pandemic, make it impossible for Mr. Hall's attorneys to conduct the factual investigation necessary to complete Mr. Hall's clemency petition or to conduct other necessary legal work.

16.     As described more fully below, Defendants have violated the U.S. Constitution and the APA by: (a) depriving Mr. Hall the minimal due process afforded to him to pursue clemency; (b) failing to provide Mr. Hall's attorneys with sufficient time to develop Mr. Hall's clemency petition and other potential judicial avenues of relief, particularly in light of the limitations imposed by the pandemic; (c) providing inadequate notice to Mr. Hall of the date of his execution; (d) changing the policy of giving notice of the date of execution in a manner that violates the *Ex Post Facto* Clause of the United States Constitution; and (e) changing the notice policy in a manner that deprives Mr. Hall of the guarantee of equal protection.

17.     Defendants' actions violate Mr. Hall's rights under Art. I, § 9, cl. 3, and the Fifth and Sixth Amendments of the U.S. Constitution, and also violate the APA.  Accordingly, Mr. Hall seeks the following relief in this action: (a) a preliminary and permanent injunction preventing Defendants from executing Mr. Hall until this Court determines that his attorneys are able to safely consult with Mr. Hall, interview witnesses, and conduct other investigations in person in connection with the clemency process and further judicial avenues of relief; (b) an order declaring that Mr. Hall's execution violates his rights under Art. I, § 9, cl. 3, and the Fifth and Sixth Amendments of the U.S. Constitution; (c) an order declaring that BOP's notice provisions, as applied to Mr. Hall's circumstances, are constitutionally deficient; (d) an order

declaring that Mr. Hall's execution violates the FDPA; and (e) any such other equitable relief as this Court deems just and proper.

18.     The claims in this Complaint are cognizable under the constitutional and statutory grounds identified herein and described in more detail below.  This action is not, and should not be treated as, a successive habeas corpus petition.  Mr. Hall is not challenging the validity of his convictions or death sentence.  Rather, Mr. Hall asserts that proceeding with his execution under the current circumstances violates the Constitution and his right to counsel pursuant to 18 U.S.C. § 3599.

## PARTIES

19.     Plaintiff Orlando Cordia Hall is a United States citizen whose death sentence was imposed by the United States District Court for the Northern District of Texas.  Mr. Hall is incarcerated at USP Terre Haute under the control and supervision of the BOP, an agency within the DOJ.

20.     Defendant William P. Barr is the Attorney General of the United States.  Mr. Hall was remanded into the Attorney General's custody upon his conviction and the imposition of his death sentence.  Attorney General Barr is the official responsible for carrying out sentences of death against federal prisoners.  Attorney General Barr is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

21.     Defendant Michael Carvajal is the Director of the United States Bureau of Prisons.  As such, he is charged with prescribing and directing the promulgation of rules and regulations for the BOP, including the rules and regulations for the conduct of prison operations and, under the 2019 Protocol, execution procedures.  Mr. Carvajal is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

22.     Defendant Barb von Blanckensee is the Regional Director of BOP for the North Central Region.  As Regional Director, Ms. von Blanckensee is responsible for overseeing the operations of facilities in twelve states, including Indiana, the state in which Mr. Hall is incarcerated at USP Terre Haute.  Ms. von Blanckensee is sued here in her official capacity for the purpose of obtaining declaratory and injunctive relief.

23.     Defendant T.J. Watson is the Complex Warden of the Federal Correctional Complex in Terre Haute, Indiana, which includes USP Terre Haute.  Mr. Watson is responsible for managing and overseeing operations at USP Terre Haute.  Mr. Watson is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

24.     Defendant Donald W. Washington is the Director of the United States Marshals Service.  As the leader of the Marshals Service, pursuant to the FDPA, Mr. Washington has the authority to supervise and carry out all federal executions.  Mr. Washington is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because this action arises and seeks relief under the laws and Constitution of the United States, specifically, Art. I, § 9, cl. 3 and the Fifth and Sixth Amendments of the U.S. Constitution and 18 U.S.C. § 3599, and 28 U.S.C. § 2202 (declaratory relief).[2]

---

[2] Mr. Hall submits that administrative exhaustion is not necessary under the Prison Litigation Reform Act, 42 U.S.C. § 1997e (the "PLRA") (or any other statute), as this suit does not challenge Mr. Hall's conditions of confinement.  Moreover, there are no available administrative remedies that could address the challenged constitutional and statutory violations.  To the extent that an "administrative procedure lacks authority to provide any relief or to take any action whatsoever in response to a complaint," then a prisoner is left with nothing to exhaust and the PLRA does not prevent the prisoner from bringing his or her claim directly to the district court." *Kaemmerling v. Lappin*, 553 F.3d 669, 675 (D.C. Cir. 2008) (internal quotation marks omitted).

26.     Venue is proper under 28 U.S.C. § 1391(b)(2) because several Defendants are located in this District and a substantial part of the events giving rise to the claims made herein, including the decision and announcement to schedule Mr. Hall's execution, took place and continue to take place in this District.

## FACTUAL BACKGROUND

27.     Mr. Hall was sentenced to death in 1995.  Until 2020, the federal government had not carried out an execution since 2003, and only three executions in total had occurred since 1963.     Fed.     Bureau     of     Prisons,     *Historical     Information*, https://www.bop.gov/about/history/federal_executions.jsp (last visited Nov. 2, 2020).   Now, however, amid a global pandemic, Defendants have scheduled Mr. Hall's execution with just 50 days' notice, depriving him of rights enumerated under the Constitution and causing him irreparable injury if the execution is allowed to proceed.

**A.     Procedural History.**

28.     On October 26, 1994, Mr. Hall—along with his brother Demetrius Hall, Bruce Webster, and Steven Beckley—was charged with kidnapping in violation of 18 U.S.C. § 1201(a)(1).  A little more than a week later, a six-count superseding indictment was returned, charging Mr. Hall and the three other original defendants, plus Marvin Holloway, with: (1) kidnapping in which a death occurred in violation of 18 U.S.C. § 1201(a)(1); (2) conspiracy to commit kidnapping in violation of 18 U.S.C. § 1201(c); (3) traveling in interstate commerce with intent to promote the possession of marijuana with intent to distribute in violation of 18 U.S.C. § 1952; (4) using a telephone to promote the unlawful activity of extortion in violation of 18

---

Since the prison grievance process provides no remedy that would assist Mr. Hall in enforcing his constitutional and statutory rights, there is no need to exhaust such procedures before resorting to the federal courts.

U.S.C. § 1952; (5) traveling in interstate commerce with intent to promote extortion in violation of 18 U.S.C. § 1952; and (6) using and carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c).  Counts 4 and 5 were later dropped.

29.     On February 23, 1995, the government gave notice that it intended to seek the death penalty against Mr. Hall and co-defendant Bruce Webster.  Thereafter, Mr. Hall's trial was severed from the trial of his co-defendants, with the other three co-defendants agreeing to testify against Mr. Hall in exchange for favorable treatment from the government.

30.     Mr. Hall's trial commenced on October 2, 1995, in Fort Worth, Texas.  *Voir dire* lasted from October 2-19.  Despite being represented at trial by two attorneys, Jeffrey Kearney and Michael Ware, only Mr. Kearney represented Mr. Hall during most of jury selection, so that Mr. Ware could begin to conduct the penalty phase investigation counsel had not undertaken prior to trial.  At the conclusion of *voir dire*, the government peremptorily struck four of the five qualified Black jurors and the defense struck the fifth.  As a result, Mr. Hall, who is Black, was convicted and sentenced to death by an all-white jury.  Assistant United States Attorney Paul Macaluso, who was instrumental in the questioning and selection of the jurors, was years later found by the U.S. Supreme Court to have committed *Batson* violations for striking Black jurors based on their race in a separate case, *Miller-El v. Dretke*, 545 U.S. 231 (2005) (referencing Macaluso by name).  The Fifth Circuit later concluded that Macaluso had discriminated against Black jurors in violation of *Batson* in yet another Texas capital case.  *See Reed v. Quarterman*, 555 F.3d 364 (5th Cir. 2009) (also identifying Macaluso by name).

31.     Mr. Hall's trial proceeded from October 24–31.  The defense presented no evidence and waived closing argument.  On October 31, 1995, the jury convicted Mr. Hall of all counts: (a) kidnapping in which a death occurred; (b) conspiracy to commit kidnapping; (c)

traveling in interstate commerce to promote possession of marijuana with intent to distribute; and (d) using and carrying a firearm during a crime of violence.

32.     The penalty phase commenced the following morning.  From November 1–3, the same all-white jury that had found Mr. Hall guilty heard testimony and argument regarding his sentence.  The government presented evidence concerning several aggravating factors, including Mr. Hall's prior felony drug convictions and bad character testimonial evidence.  As to the character witnesses, the government presented seven witnesses to speak to Mr. Hall's purported bad character, and the defense declined to cross-examine six of those witnesses.  The government also presented several witnesses from the prison where Mr. Hall was incarcerated, a prisoner and a former guard, to testify to Mr. Hall's conduct in prison, including an alleged scheme to escape from prison.  Mr. Hall's attorneys presented evidence concerning the conduct of Mr. Hall's co-defendants and offered only Mr. Hall's mother and sister as character witnesses. The district court denied Mr. Hall permission to make a brief statement expressing his remorse in allocution to the jury.  On November 6, 1995, the jury recommended the death penalty.

33.     After denying Mr. Hall's motion for a new trial, the District Court entered judgment on February 12, 1996, formally sentencing Mr. Hall to death.  The court imposed a sentence of life imprisonment for the conspiracy conviction, and sixty-months' imprisonment for each of the remaining two counts.

34.     Mr. Hall appealed his conviction and sentence on multiple grounds, including that: (a) the district court's refusal to permit him to allocute before the jury violated due process; (b) the admission of nontestimonial victim impact statements during the penalty phase violated his Sixth Amendment right to confrontation and due process and  the FDPA's evidentiary standards; and (c) the jury's failure to consider certain mitigating factors at the penalty phase,

such as the circumstances of Mr. Hall's childhood,[3] violated the Eighth Amendment and 18 U.S.C. § 3593(c)(1).  The Fifth Circuit affirmed, *United States v. Hall*, 152 F.3d 381 (5th Cir. 1998), and denied rehearing on October 1, 1998.  The Supreme Court declined review.  *Hall v. United States*, 526 U.S. 1117 (1999).

35.    In May 1999, after Mr. Hall's direct appeal had concluded, the District Court appointed Ms. Widder and Robert C. Owen ("Mr. Owen") for purposes of representing Mr. Hall in habeas corpus proceedings brought under 28 U.S.C. § 2255.

36.    In May 2000, Mr. Hall moved to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255 in the District Court.  A month later, the District Court entered a scheduling order, pursuant to which Mr. Hall filed motions for discovery in August 2000 and May 2001. The District Court denied both discovery motions in April 2002.  In June 2002, Mr. Hall filed an amended motion to vacate and, in September 2002, Mr. Hall was permitted to file a second amended motion to vacate.  As summarized by the District Court, Mr. Hall's second amended motion raised nine issues:

A. Hall's rights under the Fifth Amendment were violated because the indictment against him did not allege any aggravating factors that rendered Hall eligible for the death penalty (claim one).

B. Hall was denied his Sixth Amendment right to the effective assistance of counsel (claim two).

C. A juror's contact with the victim's family and other extraneous information that entered into the jury's deliberations violated Hall's rights under the Fifth, Sixth, and Eighth Amendments. (claims three through five).

D. The government violated Hall's rights under the Fifth and Sixth Amendments by failing to disclose exculpatory and mitigating information concerning government witness Larry Nichols (claim six).

---

[3] Marcia A. Widder ("Ms. Widder") was originally appointed under the Criminal Justice Act to represent Mr. Hall in that appeal and continues to represent Mr. Hall to this day.

E. Hall's rights under the Fifth, Sixth, and Eighth Amendments were violated because of false testimony given by government witnesses Larry Nichols and Steven Beckley (claims seven and twelve).

F. The government violated Hall's Sixth Amendment rights by using jail inmate Larry Nichols to elicit information from Hall (claim eight).

G. Hall's rights under the Fifth, Sixth, and Eighth Amendments were violated when the government provided a statement to the defense made by Alonso Airy that contained false information for the purpose of dissuading the defense from calling Airy to the stand (claim nine).

H. The government interfered with Hall's Sixth Amendment right to counsel when it advised his initial defense attorneys about information that Hall intended to kidnap the attorneys in an escape attempt (claim ten).

I. Hall's rights under the Fifth and Eighth Amendments were violated by the racially discriminatory effects of the federal capital sentence scheme (claim eleven).

*Hall v. United States*, No. 4:00-cv-00422-Y, 2004 WL 1908242, at *4 (N.D. Tex. Aug. 24, 2004).  The District Court denied these claims.  *Id.* at 37.  Mr. Hall sought permission to appeal from both the District Court and the Fifth Circuit.  Leave to appeal was denied, *see United States v. Hall*, 455 F.3d 508 (5th Cir. 2006), and the Supreme Court denied certiorari.  *Hall v. United States*, 549 U.S. 1343 (2007).

37.     Most recently, Mr. Hall sought authorization to bring a habeas challenge to his firearm conviction under 18 U.S.C. § 924(c), arguing that under *United States v. Davis*, 139 S. Ct. 2319 (2019), the predicate offense did not qualify as a crime of violence and so his conviction on that basis could not stand.  On October 30, 2020, the Fifth Circuit refused to allow Mr. Hall to pursue that claim and denied as moot his motion to stay his execution.  Order, *In re Hall*, No. 19-10345 (5th Cir. Oct. 30, 2020).  Accordingly, there are no outstanding motions seeking to stay Mr. Hall's execution.

**B.      Federal Execution Protocol.**

38.      Upon information and belief, in 1993, the Director of the BOP designated USP Terre Haute as the site of federal executions.  To set the policies and procedures to govern the execution of federal death row inmates, BOP also issued an execution protocol manual ("1993 Protocol").

39.      Upon information and belief, under the 1993 Protocol, the Warden of USP Terre Haute must, at least 90 days in advance of a scheduled execution date, notify the affected federal death row inmate in writing of the selected date.

40.      Each time BOP reissued its federal death penalty protocol through 2019, the guarantee of at least 90 days' notice remained unchanged.

41.      On July 25, 2019, DOJ announced that the BOP would administer executions of federal prisoners using a revised addendum to the BOP Execution Protocol (the "2019 Addendum") released the same day.  That same day, the BOP noticed the executions of Daniel Lewis Lee, Lezmond Mitchell, Wesley Ira Purkey, Alfred Bourgeois, and Dustin Lee Honken.[4] These executions were scheduled with between 137 and 173 days' notice.  *See infra* ¶ 51. All these executions were subsequently stayed and the dates eventually expired.

42.      On November 13, 2019, the DOJ publicly filed the Administrative Record, which included a revised BOP Execution Protocol that replaced the prior version.  (The new BOP Execution Protocol announced by the DOJ and the 2019 Addendum are sometimes referred to herein collectively as the "2019 Protocol").  The 2019 Protocol retained the mandatory 90-days' notice provision of the earlier versions.

---

[4]  *See* Press Release No. 19-807, Dep't of Justice (July 25, 2019), *available at*: https://www.justice.gov/opa/pr/federal-government-resume-capital-punishment-after-nearly-two-decade-lapse.

43.    On July 31, 2020, Attorney General William P. Barr and the other defendants in the consolidated action in which the court had entered a preliminary injunction barring the execution of Mr. Hall, issued an addendum to the 2019 Protocol, effective that day, which cut the notice-of-execution period to 50 days, with the added provision that the warden had discretion to provide as little as 20 days' notice.   *See* Ex. 2, Defs.' Notice of Fourth Suppl. to the Administrative R., *In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-00145-TSC (D.D.C. July 31, 2020), ECF No. 171.

44.    On July 31, 2020, the defendants also moved to vacate the preliminary injunction barring Mr. Hall's execution.   Defs.' Mot. to Vacate Prelim. Injs., *In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-00145-TSC (D.D.C. July 31, 2020), ECF No. 173.   Two months later, the court granted the government's motion.   *Id.*, ECF Nos. 265 & 266 (Sept. 20, 2020).

45.    Federal law has historically vested authority for carrying out all federal executions with the United States Marshals' Service.   *See* Act for the Punishment of Certain Crimes Against the United States, ch. 9, § 33, 1 Stat. 112, 119 (1790).   Congress reaffirmed that authority in 1937 when it provided that "the United States marshal" was "charged with the execution of the [death] sentence."   An Act To Provide for the Manner of Inflicting the Punishment of Death, Pub. L. No. 75-156, 50 Stat. 304 (1937).   Congress stood by this historical practice when it enacted the Federal Death Penalty Act in 1994.   *See* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994).

46.    The FDPA provides that "a United States marshal . . . shall supervise implementation of the sentence."   18 U.S.C. § 3596(a).   Section 3597(a) of the law sets out that a "United States marshal charged with supervising the implementation" of a death sentence "may

17

use appropriate State or local facilities for the purpose." *Id.* § 3597(a).  Neither section grants any authority to BOP to "supervise implementation" of a sentence of death.  18 U.S.C. § 3596(a).  Congress therefore expressly tasks the Marshals Service, and not BOP, with supervising the implementation of a federal death sentence.

47.    With its issuance of the 2019 Protocol, however, the BOP purports to assume primary authority over supervising implementation of the federal death sentence, and the Marshals Service, not mentioned in the 2019 Protocol, to relinquish its role in overseeing the federal death sentence.  When Congress delegates authority to a particular agency in a statute, that agency may not subdelegate its responsibility to another agency that is not its subordinate "absent an affirmative showing of congressional authorization."  *United States Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004); *United States v. Libby*, 498 F. Supp. 2d 1, 13-14 (D.D.C. 2007) (a "general" statute that "permits the delegation of any function of the Attorney General . . . cannot trump the clear language of the more specific prohibition on delegation" (internal quotation marks omitted).

48.    BOP and the Marshals Service are not interchangeable parts of the DOJ.  The Marshals Service and the BOP are "entit[ies] distinct and independent within [their] own sphere[s]."  *Roe v. United States Attorney*, 489 F. Supp. 4, 7 (E.D.N.Y. 1979).  Because the FDPA requires the Attorney General to use a particular agency within the DOJ, the Attorney General cannot simply reassign that duty to a different agency on his own authority.  *See United States v. Giordano*, 416 U.S. 505, 514 (1974) ("Congress does not always contemplate that the duties     assigned     to     the     Attorney     General     may     be     freely     delegated.").

C.    **Defendants Schedule and Plan to Carry Out Mr. Hall's Execution With Scant Notice.**

49.    Ten days after the district court vacated the injunction barring Mr. Hall's execution, the DOJ announced that "Attorney General William P. Barr [had] directed the Federal Bureau of Prisons to schedule the execution of Orlando Cordia Hall . . . ."[5]  The execution was scheduled for November 19, 2020 at USP Terre Haute.  *See* Ex. 1.  That same day, the BOP served notice on Mr. Hall advising him of the execution date and the timetable for filing a clemency application.

50.    The scant interval between Defendants' September 30, 2020 announcement of Mr. Hall's execution date and his scheduled execution makes Mr. Hall's the fastest announcement-to-execution timetable for any federal prisoner since the turn of the century.  Significantly, unlike four of the seven federal prisoners already executed in the last three months, this is the first time that Mr. Hall is receiving an execution date at all.  When officials standing at his cell door handed him written notice of his execution date on September 30, Mr. Hall learned that he had just 50 days to live.  No federal death row prisoner in recent memory has received such short a timeline from the BOP.  Between 2000 and 2019, a federal death row prisoner could expect to receive an average of 137 days' notice of a first announcement of an execution date and, until June 2020, no prisoner had received less than 120 days' notice from the BOP.  In fact, when Bruce Webster, the only other co-defendant of Mr. Hall to receive the death penalty, was

---

[5]    Press Release No. 20-1,034, Dep't of Justice (Sept. 30, 2020), *available at*: https://www.justice.gov/opa/pr/execution-scheduled-federal-death-row-inmate-convicted-murdering-child.

given notice of his execution date (a date that was stayed and later expired), the BOP gave him

132 days' notice.[6]

51.     The table below shows the BOP notice dates and scheduled execution dates for all

death-sentenced federal prisoners since 1963.[7]

| Name | BOP Notice Date | Scheduled Date | Number of Days From Notice Date to Scheduled Date |
|---|---|---|---|
| McVeigh, Timothy | January 16, 2001 | May 16, 2001 | 120 |
| Jones, Louis | November 14, 2002 | March 18, 2003 | 124 |
| Tipton, Richard | December 19, 2005 | May 8, 2006. | 140 |
| Johnson, Corey | December 19, 2005 | May 10 2006. | 142 |
| Roane, James | December 19, 2005 | May 12, 2006. | 144 |
| Webster, Bruce | December 5, 2006 | April 16, 2007. | 132 |
| Lee, Daniel | July 25, 2019 | December 9, 2019. | 137 |
| Mitchell, Lezmond | July 25, 2019 | December 11, 2019 | 139 |
| Purkey, Wesley | July 25, 2019 | December 13, 2019 | 141 |
| Bourgeois, Alfred | July 25, 2019 | January 13, 2020 | 172 |
| Honken, Dustin | July 25, 2019 | January 15, 2020 | 173 |
| Nelson, Keith | June 15, 2020 | August 28, 2020 | 74 |
| LeCroy, William | July 31, 2020 | September 22, 2020 | 53 |
| Vialva, Christopher | July 31, 2020 | September 24, 2020 | 55 |
| Hall, Orlando | September 30, 2020 | November 19, 2020 | 50 |
| Montgomery, Lisa | October 16, 2020 | December 8, 2020 | 54 |
| Bernard, Brandon | October 16, 2020 | December 10, 2020 | 56 |

[6] The United States District Court for the Southern District of Indiana recently vacated Mr. Webster's death sentence on the basis that he is intellectually disabled, a decision that was recently affirmed on appeal. *Webster v. Watson*, 975 F.3d 667 (7th Cir. 2020).

[7] No federal executions took place between 1963-2001.  Not all individuals on the above chart were executed after receiving their notice due to various legal challenges.  Additionally, Mr. Mitchell, Mr. Lee, Mr. Purkey, and Mr. Honken all had their initial execution dates stayed and, pursuant to the protocols, received shorter notice for their rescheduled execution dates.

52.     When the BOP jettisoned its longstanding written directive to provide at minimum 90 days' notice of a scheduled execution (and its practice of providing substantially more notice) to federal death row prisoners, it disturbed the well-settled reliance interest Mr. Hall had held in the minimum notice provision.   For the entirety of his incarceration in federal custody, Mr. Hall has understood that his window of opportunity to seek clemency and other legal remedies would span, at the very least, 90 days.

53.     The government's sudden decision to end the 90-day notice requirement and deny Mr. Hall the benefits of such notice works to his substantial disadvantage by both shortening his life and arbitrarily contracting the time available to Mr. Hall and his attorneys to seek clemency and pursue other judicial avenues for relief.

54.     The fifty days originally given to Mr. Hall to pursue a clemency petition and other redress undercuts the U.S. Supreme Court's recognition just last year that a group of federal death row prisoners needed sufficient time to pursue their pending claims for relief.   *See Barr v. Roane*, 140 S. Ct. 353 (2019) (Mem.) (denying government's motion to vacate lower court's stays of executions that had been noticed 134 days earlier, in order to allow unpressured resolution of the condemned prisoners' claims).   Those litigants received between 137 and 172 days' notice of their execution dates, a timeline that allowed them a meaningful opportunity to file and engage in actual litigation.   That timeline also afforded the litigants adequate time to pursue executive clemency, which the U.S. Supreme Court has held cannot be an entirely arbitrary process.[8]   Defendants now deny Mr. Hall that modest right by forcing him to seek

---

[8] One plaintiff, for example, submitted his clemency petition along with supporting materials, which were fully considered by the Office of the Pardon Attorney ("OPA") at a hearing, and

clemency on a truncated timeline during a global pandemic, as a result of which his attorneys cannot perform a fraction of the work and advocacy they otherwise would in support of mercy.

55.     Due process rights are protected against "the risk of an erroneous deprivation" by the procedures employed by the state.  *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

56.     "Clemency is deeply rooted in our Anglo-American tradition of law," *Herrera v. Collins*, 506 U.S. 390, 411–12 (1993) (footnote omitted), and serves as "the fail-safe in our criminal justice system."  *Harbison v. Bell*, 556 U.S. 180, 192 (2009) (internal quotation marks omitted).  Death row prisoners must be granted an opportunity to pursue this "fail-safe," and the federal system purports to provide that right.  Denial of this right is a violation of due process.

57.     By pushing his execution forward on such a truncated schedule and without adequate notice that the timeline for seeking clemency would be reduced so severely, Defendants have deprived Mr. Hall a meaningful opportunity to seek clemency with the assistance of counsel or to challenge his sentence through other judicial avenues of relief.

58.     Federal law recognizes that a capital defendant like Mr. Hall must be afforded the opportunity to be heard with respect to whether his execution should proceed even after he has received direct review of his conviction and sentence and an initial round of habeas review.  *See, e.g.*, 18 U.S.C. § 3599(e) (counsel appointed under the CJA "shall represent the defendant throughout every subsequent stage of available judicial proceedings, including . . .  applications for stays of execution and other appropriate motions and procedures, and shall also represent the defendant in such competency proceedings and proceedings for executive . . . clemency as may be available to the defendant"); 65 Fed. Reg. 48,379 (noting "the difficulty and complexity of

---

received a recommendation from OPA.  *See Mitchell v. Barr*, No. 1:20-CV-02331-RCL, 2020 WL 5062952, at *3 (D.D.C. Aug. 27, 2020).

determining [after an initial round of habeas review is complete] whether further judicial avenues of relief (such as a successive petition under 28 U.S.C. 2255) are legally possible").  By noticing his immediate execution, however, Defendants have deprived Mr. Hall a "fair opportunity" to challenge his execution, including through executive clemency.

59.     Mr. Hall's opportunity to seek clemency, and thus to litigate the claims stated herein, arose only on September 30, 2020, when his execution date was set.  By its very nature, Defendants' decision to schedule Mr. Hall's execution for November has shortened the period in which Mr. Hall may assert the claims raised in this Complaint.

60.     Allowing Mr. Hall's execution to go forward as scheduled, with inadequate notice in the midst of the COVID-19 pandemic and without an opportunity for genuine preparation and review, deprives Mr. Hall of his Constitutional and statutory rights.

### D.     Mr. Hall's Execution Date Triggers Deadlines for Filing His Clemency Petition and Additional Professional Obligations.

61.     Until just ten days before Attorney General Barr announced Mr. Hall's November execution date, Mr. Hall had for thirteen years been protected from execution by an injunction entered with the government's consent in the litigation challenging the lethal injection protocol. For most of that period, the government itself delayed taking actions that would lead to a resolution of the lethal injection litigants' claims and the lifting of the preliminary injunctions.

62.     The government's notice of execution triggered a 30-day deadline to file Mr. Hall's clemency petition and an additional 15-day period in which to file any supporting evidence.  *See* 28 C.F.R. § 1.10(b).

63.     Death-sentenced prisoners are entitled to some due process protections in their pursuit of clemency.  *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 289 (1998) (O'Connor, J., concurring in the judgment). Although clemency is an "act of grace" distinct from judicial

review—and although the majority of clemency review of death-sentenced prisoners takes place at the state level—the U.S. Supreme Court has nonetheless held that because a death-sentenced prisoner still has an interest in his life up until the time of his execution, basic protections exist to guard against wholly arbitrary review. The federal government has formalized this process even further by creating, of its own accord, regulations that govern the federal clemency process.

64.     The capital clemency regulations are intended to ensure that the President has "an appropriate amount of time to process in part and consider a clemency request," based "upon a current and complete legal and factual record"—time that normally would be allowed by "at least 120 days' notice of the date of execution." *Rules Governing Petitions for Executive Clemency: Capital Cases*, 2000 WL 1095248, 65 Fed. Reg. 48,379-02, 48,380 (Aug. 8, 2000). The notice period Mr. Hall received—70 days less than the minimum amount of notice contemplated by the regulations—is insufficient to permit proper consideration of a clemency application.  Indeed, it provides only five days for all of the following to happen:  (i) the Office of Pardon Attorney ("OPA") to receive an oral presentation from counsel, review and consider Mr. Hall's application, make a recommendation, and (ii) the President to "process . . . and consider" Mr. Hall's request for executive clemency.  The short notice Mr. Hall received arbitrarily denies him the benefit of those procedures, in violation of his due process rights. In her concurring opinion in *Woodard*,[9] Justice O'Connor stated that "some minimal procedural

---

[9] Because it is "the narrowest ground[]" for decision, Justice O'Connor's *Woodard* concurrence represents the holding of the case.  *See Marks v. United States*, 430 U.S. 188, 193 (1977) ("Generally, when a Supreme Court decision lacks a majority opinion, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'"); *see also Wellons v. Comm'r, Georgia Dep't of Corr.*, 754 F.3d 1268, 1269 n.2 (11th Cir. 2014) (recognizing Justice O'Connor's concurrence in *Woodard* as "binding precedent"); *Faulder v. Texas Bd. of Pardons & Paroles*, 178 F.3d 343, 345 (5th Cir. 1999) (applying Justice O'Connor's concurrence in *Woodard*).

safeguards apply to clemency proceedings." 523 U.S. at 289 (alterations omitted). She did not elaborate on the precise nature of those protections, but did observe that "a scheme whereby a state official flipped a coin to determine whether to grant clemency" could warrant judicial intervention, as could one "where the State arbitrarily denied a prisoner any access to its clemency process." *Id*. The denial of fair process threatened by executing Mr. Hall in the circumstance of the present case implicates both these concerns.

65. First, preventing Mr. Hall's counsel from fully developing and presenting his clemency petition—when that opportunity could readily be afforded simply by waiting until the pandemic is brought sufficiently under control to schedule Mr. Hall's execution and thereby allowing counsel to discharge their responsibilities to him—is the definition of "arbitrarily den[ying Mr. Hall] any access to [the] clemency process." *Id*. Congress expressly contemplates that without the assistance of learned counsel, an indigent death-sentenced prisoner cannot meaningfully seek clemency. *See* 18 U.S.C. § 3599. That recognition means that uncounseled "access" is no access at all. Moreover, while executive officials may not literally "flip[] a coin," *Woodard*, 523 U.S. at 289, to decide Mr. Hall's fate in the absence of receiving a fully developed submission on his behalf, they will have no factual basis for deciding whether clemency should be granted or not, and will necessarily make that decision in the dark. That is the functional equivalent of "flip[ing] a coin."

66. The regulations governing clemency petitions for individuals sentenced to death contemplate that clemency is a remedy of last resort. Indeed, they state expressly that "[n]o petition for reprieve or commutation of a death sentence should be filed before proceedings on the petitioner's direct appeal of the judgment of conviction and first petition under 28 U.S.C. § 2255 have terminated." 28 C.F.R. § 1.10(b). Instead, clemency petitions "should be filed no

later than 30 days after the petitioner has received notification from the Bureau of Prisons of the scheduled date of execution." *Id.* Petitioners then have an additional 15 days to file papers in support of the petition. *Id.*

67. The final rule promulgating 28 C.F.R. § 1.10(b)—which remains in place today— states that "an execution date set by the Bureau of Prisons…will normally provide at least 120 days' notice of the date of execution." 65 Fed. Reg. 48,379-02 at 48,380. The rule further notes that the "deadlines for filing the commutation petition and supplemental papers are intended to preserve an appropriate amount of time to process and consider a clemency request." *Id.*

68. As part of a clemency petition, clemency counsel may also "request to make an oral presentation of reasonable duration to the Office of the Pardon Attorney in support of the clemency petition." 28 C.F.R. § 1.10(c).

69. Further, clemency proceedings may be suspended if "a court orders a stay of execution for any reason other than to allow completion of the clemency proceeding," *id.* § 1.10(d)—thus further demonstrating that clemency proceedings are meant to be a course of last resort.). "The option of suspending the clemency proceedings is consistent with the view of clemency as a remedy of last resort and helps to ensure that in making a decision about clemency, the President acts only upon a current and complete legal and factual record." 65 Fed. Reg. 48379-02, at 48380.

70. Mr. Hall's appointed counsel, Ms. Widder and Mr. Owen, are statutorily bound to represent Mr. Hall at all stages of litigation, including clemency proceedings. 18 U.S.C. § 3599(e) expressly provides that: "[u]nless replaced by similarly qualified counsel upon the attorney's own motion or upon motion of the defendant, each attorney so appointed shall represent the defendant throughout every subsequent stage of available judicial proceedings,

26

including pretrial proceedings, trial, sentencing, motions for new trial, appeals, applications for writ of certiorari to the Supreme Court of the United States, and all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures, and shall also represent the defendant in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant."

71.    "Thus, once federally funded counsel is appointed to represent a state prisoner in § 2254 proceedings, she 'shall also represent the defendant in such . . . proceedings for executive or other clemency as may be available to the defendant.'  Because state clemency proceedings are 'available' to state petitioners who obtain representation pursuant to subsection (a)(2), the statutory language indicates that appointed counsel's authorized representation includes such proceedings."  *Harbison*, 556 U.S. at 185–86 (citation omitted).  The same duties apply to counsel in the context of federal clemency.  *See id*. at 186–87 (interpreting 18 U.S.C. § 3599(e) as applying to both federal and state clemency proceedings).

72.    The national standards of practice that govern representation in capital cases are reflected in a host of guidelines.  These standards include the American Bar Association ("ABA") Standards for Criminal Justice, the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines"), the ABA Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases ("ABA Supplementary Guidelines"), the National Legal Aid and Defendant Association ("NLADA") Performance Guidelines for Criminal Defense Representation, and the NLADA Standards for the Appointment and Performance of Counsel in Death Penalty Cases.

73.    ABA Guideline 10.15.1(B) provides as follows: "If an execution date is set, post-conviction counsel should immediately take all appropriate steps to secure a stay of execution

and pursue those efforts through all available fora."   NLADA Standard 11.9.5(b) likewise provides that "[c]ounsel should take immediate steps to seek a stay of execution, and to appeal from any denial of a stay, in any and all available courts when an execution date is set.  Counsel should continually monitor the client's mental, physical and emotional condition to determine whether any deterioration in the client's condition warrants legal action."

74.     ABA Guideline 10.15.2 provides:   "Clemency counsel should ensure that clemency is sought in as timely and persuasive a manner as possible . . . D. Clemency counsel should ensure that the process governing consideration of the client's application is substantively and procedurally just, and, if it is not, should seek appropriate redress."

75.     And ABA Guideline 10.7, which governs the investigation to be conducted under Guidelines 10.15.1 and 10.15.2, requires counsel at every stage to investigate (1) medical history, including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage; (2) family and social history; (3) educational history; (4) military service; (5) employment and training history; and (6) prior juvenile and adult correctional experience.  *ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, Guideline 10.7, Commentary, 31 Hofstra Law Rev. 913, 1022-23 (rev. ed. 2003).   In other words, this Guideline requires clemency counsel to undertake an investigation that is substantially the same in scope as is required for a post-conviction proceeding.

76.     Failure to adhere to these standards constitutes a violation of an attorney's ethical and professional responsibilities.  *See Wiggins v. Smith*, 539 U.S. 510 (2003).

77.     In connection with his habeas proceedings, Mr. Hall's attorneys, Ms. Widder and Mr. Owen, previously conducted an investigation into Mr. Hall's circumstances and his

background, which largely occurred between 2001 and 2004.  Ex. 3, Declaration of Robert C. Owen ("Owen Decl.") ¶ 8.  However, this investigation was incomplete due to funding limitations imposed by the district court presiding over Mr. Hall's habeas proceedings.  *Id.*  Ms. Widder and Mr. Owen also submitted a clemency petition in late 2016, in case President Obama chose to exercise his clemency powers to commute the sentences of death row inmates.  *Id.*  That petition, though, was hastily prepared, facially incomplete, and inadequate, focusing primarily on systemic flaws with the administration of the federal death penalty such as geographic and socio-economic inequities and racial bias.  It sketched out only briefly the other personal circumstances specific to Mr. Hall that warranted mercy.  *Id.* ¶¶ 8–9.  That petition was withdrawn when the prior administration ended with just two death-sentence commutations, and in recognition of the fact that the clemency petition was insufficient to stand on its own if President Obama was not contemplating a broader clemency action.  *Id.* ¶ 8.

78.   To this day, no fulsome investigation has been conducted to support a host of issues, described below, all of which need to be fully developed for counsel to prepare an adequate petition for commutation on Mr. Hall's behalf.

### E.   The COVID-19 Pandemic and Corresponding Restrictions.

79.   The onset of the COVID-19 pandemic has made investigating and pursuing clemency proceedings on Mr. Hall's behalf functionally impossible.

80.   Since late 2019, the world has seen a dramatic outbreak of the novel coronavirus, COVID-19.  The United States, in particular, has experienced one of the largest rates of infection, and the federal prison system has been far from immune from the impacts of the pandemic.

81.    The disease caused by the COVID-19 virus is characterized by its high rate of transmission.  *See* Steven Sanche et al., *High Contagiousness and Rapid Spread of Severe Acute Respiratory Syndrome Coronavirus*, 26 Emerging Infectious Diseases 1470 (2020), *available at*: https://wwwnc.cdc.gov/eid/article/26/7/20-0282_article.   Of course, the virus has also proven fatal, particularly to seniors and those with underlying medical conditions.  *See Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions*, The Centers for Disease Control    and    Prevention    ("CDC")    (Oct.    16,    2020),    *available    at*: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated Nov. 2, 2020).   Even when not fatal, "there are many ways the infection can affect someone's health," including by causing long-term damage to the heart. *Coronavirus Disease 2019 (COVID-19): Long-Term Effects of COVID-19*, CDC, *available at*: https://www.cdc.gov/coronavirus/2019-ncov/long-term-effects.html   (last   updated   Sept.   16, 2020)*.*

82.    On January 31, 2020, in response to the emergence of COVID-19 in the United States, Health and Human Services Secretary Alex M. Azar II declared a public health emergency.  *Secretary Azar Declares Public Health Emergency for United States for 2019 Novel Coronavirus*,   Dep't   of   Health   &   Human   Servs.   (Jan.   31,   2020),   *available   at*: https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergency-us-2019-novel-coronavirus.html.

83.    On March 6, 2020, Indiana Governor Eric J. Holcomb declared a public health emergency in Indiana, where Mr. Hall is incarcerated.  Executive Order 20-02: Declaration of Public Health Emergency for Coronavirus Disease 2019 Outbreak, State of Ind. (Mar. 6, 2020), *available                          at*:                          https://www.in.gov/gov/files/20-

02ExecutiveOrder(DeclarationofPublicHealthEmergencyforCOVID-19)FINAL.pdf.  The public health emergency in Indiana was renewed most recently on October 30, extending the period of emergency through at least December 1, 2020.  Executive Order 20-47, Eighth Renewal of the Public Health Emergency Declaration for the COVID-19 Outbreak, State of Ind. (Oct. 30, 2020), *available at*: https://www.in.gov/gov/files/Executive-Order-20-47-Eighth-Renewal-of-Emergency-Declaration_2.pdf.  As of Monday November 2, 2020, the rates of infection in Indiana are on the rise and the state had reported more than 3,000 new cases over four out of the past five days.  Shari Rudavsky, *Indiana Coronavirus Cases: 3,080 New Cases, 26 New Deaths Reported*, Indianapolis Star (Nov. 2, 2020), *available at*: https://www.indystar.com/story/news/health/2020/11/02/indiana-covid-cases-3-080-new-cases-26-new-deaths-reported/6123587002/.

84.    On March 13, 2020, President Donald J. Trump declared a national emergency. *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, White House (Mar. 13, 2020), *available at*: https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak.

85.    The CDC reports that the total number of COVID-19 cases in the United States is over 9.2 million and the total number of deaths currently stands at 230,893.  U*nited States COVID-19 Cases and Deaths by State*, CDC, *available at*: https://covid.cdc.gov/covid-data-tracker/?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fcases-updates%2Fcases-in-us.html#cases_casesper100klast7days (last visited Nov. 3, 2020).

86.     The United States is currently experiencing a dramatic surge in COVID-19 cases. On October 30, the United States hit its highest daily number of coronavirus cases since the pandemic began, recording at least 99,000 new infections.  Mitch Smith, *U.S. Coronavirus Cases Set New Record as Infections Soar*, N.Y. Times (Oct. 30, 2020), *available at*: https://www.nytimes.com/2020/10/30/us/us-coronavirus-case-record.html.          COVID-19 hospitalizations increased in 38 states during the past ten days. William Wan & Jacqueline Dupree, *U.S. Hits Highest Daily Number of Coronavirus Cases Since Pandemic Began*, Wash. Post (Oct. 23, 2020), *available at:* https://www.washingtonpost.com/health/2020/10/23/covid-us-spike-cases.  The number of daily deaths nationally has crested above 1,000 in recent days. *Id.* In the past two weeks, 24 states have broken their records for single-day highs of cases.  *Id.* More than 170 counties across 36 states were designated rapidly rising hotspots, according to an internal federal report produced for officials at the Department of Health and Human Services. *Id.*

87.     The states where the persons most relevant to Mr. Hall's clemency investigation and proceedings (including Mr. Hall, Mr. Hall's family members, and other witnesses) reside have been very hard hit by the pandemic and are currently witnessing a spike in cases, consistent with recent national trends.  For example:

      a.   Indiana:          182,108 cases reported; 19,501 in the past seven days

      b.   Texas:          904,855 cases reported; 42,480 in the past seven days

      c.   Arkansas:          113,057 cases reported; 6,942 in the past seven days

      d.   Louisiana:          187,720 cases reported; 4,145 in the past seven days

e.  Wisconsin:   241,432 cases reported; 32,506 in the past seven days[10]

f.  Missouri:   185,535 cases reported; 14,513 in the past seven days

United States COVID-19 Cases and Deaths by State, CDC (last visited Nov. 3, 2020), *available at:*                                    *https://covid.cdc.gov/covid-data-tracker/?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fcases-updates%2Fcases-in-us.html#cases_casesper100klast7days.*

88.   The federal prison system has seen a rampant spread of the virus.  At last count, 17,622 federal prisoners have tested positive for COVID-19, and 991 BOP staff members have been infected.   COVID-19 Coronavirus, BOP (last visited Nov. 3, 2020), *available at*: https://www.bop.gov/coronavirus.  At least 130 federal prisoners have died from the virus.  *Id.*

89.   At the Terre Haute complex, at least 236 prisoners have tested positive for COVID-19.  *Id.*  In September, two inmates at the Terre Haute complex died of COVID-19 in the span of two days.  Michael Balsamo, *Two Dead of Virus at US Prison Where Executions Are Scheduled*, Associated Press (Sept. 15, 2020), https://apnews.com/article/prisons-politics-executions-terre-haute-indiana-1f64ccb53cefd9a069c8fb1629fe0995.

90.   The rate of infection in prisons in the United States continues to outpace that of the general population.  Specifically, the rate of 3,251 cases per every 100,000 prisoners is "5.5 times higher than the US population case rate of 587 per 100,000."  Brendan Saloner, PhD, et al., COVID-19 Cases and Deaths in Federal and State Prisons, 1-2, J. of Am. Med. Ass'n (July 8, 2020), *available at*: https://jamanetwork.com/journals/jama/article-abstract/2768249. The death

---

[10] According to Governor Tony Evers, 90 percent of hospital intensive care unit beds are full in some areas of Wisconsin.  The first patient was admitted Wednesday, October 28 to a makeshift field hospital erected at a state fairground.  *See* William Wan & Jacqueline Dupree, *U.S. Hits Highest Daily Number of Coronavirus Cases Since Pandemic Began*, Wash. Post (Oct. 23, 2020), *available at:* https://www.washingtonpost.com/health/2020/10/23/covid-us-spike-cases/.

rate amongst prisoners infected with the virus, standardized against the broader US population, is roughly three times higher "than would be expected if the age and sex distributions of the US and prison populations were equal." *Id.* at 2.

91.     As a result, BOP had curtailed in-person visits, only lifting restrictions last month (October 2020).   Bureau to Resume Social Visits, BOP (Sept. 30, 2020), *available at*: https://www.bop.gov/resources/news/20200902_visitation.jsp.

92.     The CDC's official guidance also discourages travel, as "[t]ravel increases your chance of getting and spreading COVID-19."  Coronavirus Disease 2019 (COVID-19): Travel During   the   COVID-19   Pandemic,   CDC   (Oct.   21,   2020),   *available   at*: https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-during-covid19.html.

93.     Restrictions imposed on travel and by the BOP render the meetings necessary to complete Mr. Hall's clemency petition infeasible.

**F.     The Unprecedented COVID-19 Pandemic Prevents Mr. Hall's Counsel From Discharging Their Professional Responsibilities to Their Client in the Short Timeframe Allotted.**

94.     In light of the unprecedented COVID-19 pandemic, Mr. Hall's attorneys cannot complete a clemency petition that comports with constitutional, statutory, and professional norms within the short time frame created by the lifting of the stay in Mr. Hall's case and the immediate announcement thereafter by Attorney General Barr that Mr. Hall would be put to death on November 19.

95.     Professional norms dictate that all interviews required to complete Mr. Hall's clemency petition must be conducted in-person.  *See* Ex. 4, Declaration of Dr. Elizabeth Vartkessian ("Vartkessian Decl.") ¶¶ 10, 19; Ex. 5, Declaration of Randi Chavez ("Chavez Decl.") ¶ 7; Ex. 6, Declaration of Tivon Schardl ("Schardl Decl.") ¶ 5; Ex. 7, Declaration of

Monica Foster ("Foster Decl.") ¶ 8; Ex. 14, Declaration of Jeremy Schepers ("Schepers Decl.") ¶ 5. In-person interviews allow counsel to build a rapport with witnesses and to assess the best ways in which to utilize the information given by witnesses. *See* Vartkessian Decl., App. 2 ¶ 24; Schardl Decl. ¶ 5; Foster Decl. ¶¶ 8-9; Schepers Decl. ¶ 5. Most often, multiple interviews must be conducted so as to develop trust between the interviewer and interviewee. *See* Ex. 8, Declaration of Benjamin B. Wolff ("Wolff Decl.") ¶ 7; Schardl Decl. ¶ 5; Foster Decl. ¶¶ 8-9; Schepers Decl. ¶ 5. Without such an opportunity, adequate development of an inmate's petition is sure to be wanting. *See generally* ABA Guidelines 10.15.2 (describing the duties of clemency counsel).

96.     Organizations representing individuals in capital cases in Texas, where much of the clemency investigation in Mr. Hall's case would take place, have suspended in-person interviews due to the risks posed by the ongoing COVID-19 pandemic. *See* Chavez Decl. ¶¶ 8, 10; Wolff Decl. ¶¶ 8, 10-11; Schardl Decl. ¶ 10-11; Foster Decl. ¶¶ 5-7, 10, 12; Schepers Decl. ¶¶ 7-11. These organizations continue to monitor the situation, but are unable to conduct these interviews while the uncontained virus continues to spread. *See* Chavez Decl. ¶ 10, Wolff Decl. ¶ 11; Schardl Decl. ¶ 11; Foster Decl. ¶¶ 5-7, 10, 12; Schepers Decl. ¶¶ 7-11.

97.     Regular, in-person client visits are also a hallmark of professional standards governing capital cases. *See generally*, Am. Bar Ass'n, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, 31 Hof. L. Rev. 913 (Feb. 2003), https://www.americanbar.org/content/dam/aba/administrative/death_penalty_representation/2003 guidelines.pdf. Infrequent in-person visits undermine counsel's relationship with a client and "jeopardize the provision of high quality legal representation in accordance with the[] [ABA] Guidelines." *Id.* at 956 n.98, 1008. In-person conversations are imperative, especially as an

execution date approaches, to ensure the protection of a client's rights; develop any facts that may serve useful in continuing to advocate on his or her behalf; counsel the client as needed; and coordinate any needed communications with friends, family, and advisers. *See* ABA Supplementary Guideline 10.11(C) (requiring "in-person, face-to-face, one-on-one interviews" with "the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death.").

98.    Were it possible to submit a clemency petition under current conditions, it is anticipated such a petition would argue for clemency based, at least, upon the following: (a) Mr. Hall's background and character; (b) his exemplary conduct during previous terms of imprisonment and during his many years on death row; (c) the falsity of the alleged scheme to escape from prison prior to his trial; (d) Mr. Hall's culpability as compared to his co-defendants'; (e) Mr. Hall's strong connections to his immediate and extended family, and the love and support he has given his children from death row; and (f) a video presentation in support of clemency, featuring witnesses with relevant information on each of the foregoing subjects.  These avenues are discussed in greater detail below.  Completing the petition would require extensive factual investigation and in-person meetings with Mr. Hall, his family, and other witnesses, who are located in Arkansas, Texas, Louisiana, and Wisconsin, among other places.

99.    Mr. Hall's attorneys reside in Chicago, Illinois (Mr. Owen) and Atlanta, Georgia (Ms. Widder), and would have to travel by airplane and other means to locate and interview all of the potential witnesses who possess information relevant to Mr. Hall's clemency proceedings. In addition to the limitations that COVID-19 has imposed on all persons in the United States, Mr. Hall's counsel face particular barriers to adequately developing his clemency petition.

100.    For two reasons described in more detail below, it is nearly impossible for Ms. Widder, who has represented Mr. Hall since 1997, to travel for the sake of completing Mr. Hall's clemency petition before his execution.   First, she has particular medical conditions and a medical history that place her at an elevated risk from exposure to COVID-19.   Second, she is the sole caretaker for her daughter, such that she cannot abandon her daughter, and while the pandemic rages, cannot readily leave her in the care of others.   *See generally* Ex. 9, Declaration of Marcia A. Widder ("Widder Decl.").

    a.   Three decades ago, Ms. Widder became ill with tuberculosis in New York City. She was hospitalized for eighteen days.   After her hospitalization, Ms. Widder isolated in her Brooklyn apartment and underwent months of chemotherapy treatment.   *Id.* ¶¶ 9-10.  After six months of treatment, Ms. Widder recovered.   *Id.* ¶ 10.   However, due to her medical history, she is at increased risk of serious illness, and potentially death, were she exposed to the COVID-19 virus.   *Id.* ¶ 11.

    b.   Additionally, Ms. Widder is a former smoker of many years, which places her at higher risk of severe illness from COVID-19.   *Id.* ¶ 11 n.2; *see* Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions, CDC (Nov. 2, 2020), *available at*: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html ("Being a current or former cigarette smoker increases your risk of severe illness from COVID-19.").

    c.   Ms. Widder is also fifty-nine years old and has a body-mass index of 27.4, factors that may increase the risk of severe complications from COVID-19.   Widder Decl. ¶ 11 n.2.

d.  Beyond the risk associated with her own medical history, Ms. Widder also is the sole provider for her twelve-year-old daughter, who also has an underlying health condition that places her at heightened risk.  Ms. Widder lives in a small home with her daughter, and has no family or other help that could provide care for her daughter in her absence.  Were Ms. Widder required to travel, she would be required—for her own health and the health of her daughter—to quarantine from her daughter, who faces her own health risks.  *Id.* ¶¶ 12-13. Given the size and layout of their home, it would be near impossible to effectively quarantine from her child, and occupying the same home together would put Ms. Widder's daughter at risk of infection.  *See* Sandee LaMotte & Virginia Langmaid, *Household Spread of COVID-19 Is Common and Quick, a New CDC Study Finds*, CNN (Oct. 30, 2020), https://www.cnn.com/2020/10/30/health/household-spread-covid-19-wellness/index.html.

e.  Additionally, given conditions in Georgia, virtually no in-person investigation is being performed by lawyers and investigators employed by Ms. Widder's office. Widder Decl. ¶ 11.

f.  Accordingly, due to the intolerable risks to her own health and the care of her daughter, Ms. Widder is unable to conduct the travel needed to complete Mr. Hall's clemency petition while the pandemic continues unabated.

101.  Mr. Owen likewise is unable to travel to conduct the work necessary to complete Mr. Hall's clemency petition.  Mr. Owen has been informed by his doctor that he has at least two medical conditions that place him at greater risk of serious illness or death if he were to be exposed to COVID-19.  Owen Decl. ¶ 30.  Additionally, Mr. Owen's age further increases his

risk.  *Id.*  Were Mr. Owen to travel, his return would also threaten the health and safety of his family, including his wife, who has a life-long medical condition that can cause her trouble breathing.  *Id.* ¶ 31.  Were Mr. Owen to travel outside of his hometown of Chicago, he would be required to quarantine for 14 days upon his return, or else face a substantial civil penalty. Vartkessian Decl. ¶ 20.

102.    Travel associated with Mr. Hall's clemency petition would necessarily involve in-person meetings with numerous individuals, placing Mr. Hall's attorneys at heightened risk for exposure to COVID-19.[11]

103.    Foregoing in-person interviews and substituting contact with potential witnesses via other means of communication is wholly inadequate for a variety of reasons.  "More can be learned about a person, their habits, beliefs, and values by a single visit to their home than can be learned in any number of conversations over the phone or by video."  Vartkessian Decl. App. 2 ¶ 26.  Phone calls and video conferencing would be inadequate, given the number of witnesses, and the importance of assessing a host of factors most readily ascertainable through an in-person home visit.  *See id.* ¶ 19.

104.    In the current climate, given the substantial health and safety risks posed by in-person meetings, even otherwise friendly witnesses may be hesitant or hostile to the notion of meeting face-to-face with an investigator.  *Id.* App 2 ¶ 28.

105.    In-person interviews are the only suitable option for adequately developing facts necessary to complete Mr. Hall's clemency petition—both because they are the only sorts of

---

[11] Mr. Hall's newly retained counsel at Hogan Lovells US LLP are likewise unable to travel. Hogan Lovells was retained to represent Mr. Hall pro bono on October 29, 2020 (the day before his clemency petition was due), and the current pandemic conditions, coupled with the available time prior to execution and substantial factual record make it functionally impossible for Mr. Hall's new counsel to undertake an adequate investigation.

interviews likely to elicit information relevant to Mr. Hall's clemency petition, and also because doing such interviews in person is what professional norms require of Mr. Hall's attorneys. Were Mr. Hall's attorneys to attempt to conduct such interviews at this time, however, they would risk not only their own health and safety, but also the distinct possibility that witnesses would be unwilling to meet now or in the future.

### G.   Mr. Hall's Clemency Petition is a Substantial Undertaking Which Is Impossible to Complete Under the Current Circumstances.

106.   A complete factual investigation sufficient to prepare Mr. Hall's clemency petition would require exploring several areas of inquiry in significant detail.

107.   The limited investigation Mr. Hall's attorneys performed more than a decade ago in connection with Mr. Hall's post-conviction proceedings reveals that the circumstances of Mr. Hall's upbringing were traumatizing and painful.  Because trial counsel failed to develop these facts, the all-white jury that convicted Mr. Hall and sentenced him to death never learned this critical information, which was presented only at a highly generalized and unpersuasive level.[12] Mr. Hall's attorneys would intend to speak with witnesses who could corroborate particular especially important events in Mr. Hall's background, as well as with the jurors who served at his trial.  Owen Decl. ¶¶ 10-11.

---

[12] Mr. Hall's trial counsel presented a superficial and abbreviated case at the sentencing hearing, offering only eight witnesses.  Six described bad qualities of co-defendants Webster and Beckley, and Mr. Hall's behavior in jail while awaiting trial.  Only two witnesses, Mr. Hall's mother Betty and his sister Cassandra Ross, touched on Mr. Hall's upbringing and character, and trial counsel failed to elicit anything more than vague and conclusory descriptions.  Based on this sketchy evidence, only one juror found the "circumstances surrounding [Hall's] upbringing" mitigating, a finding the Fifth Circuit found reasonable given that the evidence trial counsel presented was insubstantial.  *See United States v. Hall*, 152 F.3d 381, 413 (5th Cir. 1998).

108.    As to Mr. Hall's upbringing, Mr. Hall's attorneys also have information that as an adolescent, Mr. Hall was left to care for his two younger brothers, Demetrius Hall and Tracy Hall, with no adult in the home.  Demetrius additionally was a witness to violent attacks on his mother Betty at the hands of his (and Mr. Hall's) father A.J. in the family household when Demetrius and Mr. Hall were children, and likewise saw Mr. Hall suffer serious physical abuse at the hands of both parents, including being beaten with switches and belts.  Mr. Hall's attorneys believe it is essential to Mr. Hall's clemency application that they meet with Demetrius in person (something they were unable to do during 2255 proceedings) to explore his recollections about these emotionally difficult and sensitive matters, and to assist him in crafting a declaration to convey his first-hand experiences of Mr. Hall's turbulent family history and the damage it caused to him and his siblings.  *Id.* ¶ 13.

109.    Mr. Hall's attorneys also understand, based on information acquired in 2016, that Mr. Hall as a child was the victim of sexual assault at the hands of an adult neighbor.  While this individual has since passed away, Mr. Hall's attorneys would intend to interview others who may be able to corroborate Mr. Hall's account.  For example, Mr. Hall's older brother Scottie Hall (Arkansas), his younger brother Demetrius Hall (Texas), and the abuser's wife (presumably in Louisiana or Arkansas) may all have information relevant to his inquiry.  Mr. Hall's attorneys also need to identify an expert in child sexual abuse who can evaluate the impact that these traumatic experiences had on Mr. Hall, including conducting an in-person mental health evaluation.  *Id.* ¶ 14.

110.    Mr. Hall has exhibited exemplary conduct in prison.  Prior to his current incarceration, he served only one prison term, when he was incarcerated in the Arkansas state prison system for selling drugs.  During that incarceration, Mr. Hall did not commit a single

disciplinary infraction – proving him, in the words of a corrections expert, an "ideal inmate." Additionally, other BOP officials and guards have spoken positively of Mr. Hall's current period of incarceration.   Individuals with knowledge of Mr. Hall's conduct—including guards, counselors, psychologists, and medical personnel (in Indiana and Texas, and potentially other places unknown)—in state and federal prison would need to be interviewed to develop information. *Id.* ¶¶ 15–21.

111.   Prior to trial, Larry Nichols, another prisoner in the facility where Mr. Hall was being held, informed the government that Mr. Hall was planning an escape attempt in which he intended to take his own attorneys and/or the trial judge hostage.  The government then called Nichols to testify to those same allegations at Mr. Hall's capital sentencing hearing.  Mr. Hall, however, has consistently maintained that no such plan ever existed and that he had no connection to a homemade weapon introduced at trial that was recovered from a common area in the jail.  Benjamin C. Millican and Haywood G. Alexander, inmates in the same jail area at the same time, may have relevant information that would undermine the testimony of Larry Nichols and thus support Mr. Hall's claim that he is not a danger to anyone and has adjusted peaceably to confinement. *Id.* ¶¶ 22-23.

112.   Further, Mr. Hall has always maintained that despite his involvement in abducting, holding, and eventually killing Ms. Rene, he did not sexually assault her.  As a result, Mr. Hall's attorneys intend to interview codefendants Steven Beckley and Marvin Holloway (as well as Mr. Hall's younger brother Demetrius Hall). All three were incarcerated for varying terms of years in connection with this case and all three have been released from custody since Mr. Hall's § 2255 proceeding concluded.  In particular, Mr. Hall's attorneys need to interview Mr. Beckley to explore why he did not accuse Mr. Hall of sexually assaulting Lisa Rene until he

had already made repeated custodial statements that never mentioned that presumably significant fact—even though, in his multiple prior statements, he fully inculpated himself in the crime (including confessing that he sexually assaulted Lisa Rene), and inculpated Mr. Hall in all the events of the crime except Ms. Rene's sexual assault.  Mr. Hall's attorneys would also interview formerly death-sentenced codefendant Bruce Webster, who at this time has had his death sentence vacated on the ground that he is a person with intellectual disability, as soon as that decision becomes final.  *Id.* ¶ 24.

113.    Mr. Hall's attorney would also intend to have a qualified polygraph examiner question Mr. Hall on factual issues that remain in dispute, as such an exercise may serve as compelling evidence to aid in his clemency petition.  Specifically, Mr. Hall has denied that he: (1) plotted an escape from prison and (2) participated in the sexual assault of Lisa Rene.  Such an examination would require in-person contact between Mr. Hall and the examiner, and likely also in-person meetings between counsel and the examiner to prepare for the examination.  As with the other in-person tasks considered, this examination is infeasible under current conditions.  *Id.* ¶ 29.

114.    Perhaps the most significant—and significantly unfinished—task in fully developing a clemency application for Mr. Hall is providing a detailed account of the very strong bonds he shares today with his immediate and extended family, and the vital and positive role he plays in their lives.  Mr. Hall maintains near-constant contact with his family members via telephone and email.  To present a fully developed case for mercy in 2020, Mr. Hall's attorneys need to interview family members to understand Mr. Hall's relationship with each.  There is a tremendous amount of additional information to be gathered from family interviews about the value of Mr. Hall's life to his loved ones, as reflected in how their relationships with him have

grown and deepened over those fifteen years.  The family members to be interviewed in person include:

a.    Betty Hall (Mr. Hall's mother, in Arkansas);

b.   Cassandra Ross (his sister, in Texas);

c.   Jerry Ross (his brother-in-law, in Texas);

d.   Marco Ross (his nephew, in Texas);

e.   Skyler Ross (his niece, in Texas);

f.   Pamela Palmer (his sister, in Arkansas);

g.   Tracy Hall (his younger brother, in Arkansas);

h.   Demetrius Hall (his youngest brother, in Texas);

i.   Scottie Hall (his older brother, in Arkansas);

j.   Albert Moore (his half-brother, in Louisiana);

k.   Jackie Rice (his half-brother's wife, in Louisiana);

l.   Shontay Anders (his daughter, in Texas);

m.   Preisha Green (his daughter, in Arkansas);

n.   Te'Aushia Hall (his daughter, in Arkansas);

o.   Orlando Hall, Jr. (his son, in Wisconsin);

p.   Shanyce Matthews-McGee (mother of Orlando Hall, Jr., in Wisconsin);

q.   Eric Hampton (his son, in Arkansas);

r.   Jamie Garrett (mother of Eric Hampton, in Arkansas);

s.   Juanita Taylor (his cousin, in Arizona);

t.   Alexis Tubbs (his niece, in Arkansas);

u.   Tantarras Smith (his niece, in Arkansas);

> > v.   Kevin Norful (his nephew, in Missouri);
>
> > w.   Vada Smith (family friend, in Arkansas);
>
> > x.   Christopher Thomas (friend, in Arkansas).

Each of Mr. Hall's children now has children of their own, and many of those children are old enough to have their own relationships with Mr. Hall that stretch back as much as a decade.  Those family members, too, must be interviewed in person.  *Id.* ¶ 26.

115.    Jurors' views about the appropriateness of carrying out a death sentence can change over time.  For example, a juror might learn that the defendant has adjusted peaceably to prison in the years since trial and has proved to be a model inmate rather than posing a continuing threat to others.  Such a juror might conclude as a result that she was mistaken to assume that only execution, rather than confinement, could adequately protect society from the defendant.  Where jurors' views have undergone such changes, it is vital that the executive decision-maker know about them in weighing whether to grant clemency.  And a change in juror's views have previously swayed decision makers to grant clemency. *See* Nick Swartsell, *John Kasich Commutes Death Sentence for Raymond Tibbetts*, Cleveland Scene (July 20, 2018), *available at*:  https://www.clevescene.com/scene-and-heard/archives/2018/07/20/john-kasich-commutes-death-sentence-for-raymond-tibbetts; Christian Boone, *Georgia Parole Board Spares Life of Condemned Prisoner*, AJC.com (Jan. 17, 2020), available at https://www.ajc.com/news/crime--law/parole-board-spares-life-prisoner-hours-before-scheduled-execution/42CP5fZsPOcrRJIcHvUbUK/.  Accordingly, after obtaining permission from the presiding judge pursuant to local rules, Mr. Hall's attorneys need to interview the trial jurors, all or most of whom are likely still in Texas:

> > a.   Marcia Dawn Graves;

b.   Timothy Ray Nesbit;

c.   Donald Robert McCormick;

d.   Benjamin T. McGowen;

e.   "Mary Ann" Herring;

f.   Jacquelyn Kay Holmes;

g.   Linda Louise Harrell;

h.   Patsy A. Brandon;

i.   Gary Clarence Killion;

j.   Billy Dwayne Dean; and

k.   Stacey Leigh Donaldson.

Owen Decl. ¶ 27.

116.   The prevailing standard of practice for capital defense supports creating a video presentation to accompany and supplement Mr. Hall's clemency application.  Compelling visual images would help bring to life the case for mercy.  Such a video could ultimately include footage of any of the potential witnesses identified above and would, at a minimum, include footage of Mr. Hall.  Creating such a video would require Mr. Hall's attorneys to have in-person contact with Mr. Hall and the witnesses.  *Id.* ¶ 28.

117.   As a result, there is significant factual investigation and development that needs to take place before Mr. Hall's attorneys can file a clemency petition on his behalf.  That work would involve, at the very least, conducting in-person interviews with a substantial number of witnesses—including former and current BOP employees and family members located across the country—as well as Mr. Hall. Such investigation could, as well, disclose evidence that potentially would form the basis for further judicial avenues of relief.

118.    On October 30, 2020—the statutorily imposed deadline for Mr. Hall to submit a petition for commutation of his death sentence—Mr. Owen sent the Office of Pardon Attorney ("OPA") a lengthy letter detailing the aforementioned needed investigation, and seeking a reprieve from Mr. Hall's execution date.  Ex. 10, Letter from Robert Owen and Marcia Widder, Counsel for Orlando Hall, to Hon. Rosalind Sargent-Burns, Acting Pardon Attorney, U.S. Dept. of Justice, and Hon. Pat Chipollone, White House Counsel (Oct. 30, 2020).

119.    Mr. Owen received an automated response from OPA.  Ex. 11, E-mail from USPardon.Attorney@usdoj.gov to R. Owen (Oct. 30, 2020).  The response stated that it can take "1-3 months for newly received (within the past 90 days) clemency cases to be accepted for review and added to our system as 'pending'."  Id.  The e-mail further observes that the process "is extremely lengthy due to the volume of matters pending and the need to carefully examine and investigate all requests and supporting documentation."  Id.

120.    On November 2, 2020, Mr. Owen received a phone call from Kira Gillespie ("Ms. Gillespie") at OPA.  Ms. Gillespie advised that OPA lacks any authority to reprieve, withdraw, or reschedule Mr. Hall's execution date. She further indicated that with Mr. Owen's and Mr. Hall's authorization, OPA could construe the October 30, 2020 letter as a petition for commutation.  However, as the October 30, 2020 letter was not in fact such a  petition, Mr. Owen explained that it could not be construed as one and that, in fact, such treatment may constitute a violation of Mr. Owen's and Ms. Widder's professional obligations to Mr. Hall.  Mr. Owen sent an email to Ms. Gillespie confirming the same. Ex. 12, Email from R. Owen to Office of Pardon Attorney (Nov. 2, 2020).

121.    In reply, the OPA indicated that if Mr. Owen were willing to construe the October 30, 2020 letter as a petition for commutation, the OPA would accept supplemental materials in

support of a clemency petition until November 14, 2020, and conduct a telephonic hearing during the week of November 2. Ex. 13, Email from Office of Pardon Attorney to R. Owen to (Nov. 2, 2020).

## CLAIMS FOR RELIEF

### Count I
### (Fifth Amendment Violation – Denial of Due Process)

122.   Mr. Hall hereby incorporates by reference all allegations of the preceding paragraphs as if fully set forth herein.

123.   Mr. Hall's November 19 execution will amount to a violation of his constitutional rights under the Fifth Amendment because arbitrarily setting his execution date in the midst of the COVID-19 pandemic with only 50 days' notice makes it functionally impossible for his attorneys to provide the clemency representation to which he is constitutionally entitled.

124.   The Supreme Court has found that "some minimal procedural safeguards apply to clemency proceedings." *Woodard*, 523 U.S. at 289.

125.    "[T]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."  *Mathews,* 424 U.S at 333 (internal quotation marks omitted). *Mathews* identifies three factors courts should consider in evaluating the requirements of due process:

"First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id*. at 335.

126.   The Supreme Court has recognized that "process is not an end in itself" and "its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement," *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983).  As recognized in the D.C.

Circuit, "to state a procedural due process claim, a plaintiff must plead that a life, liberty, or property interest was at stake, that government action resulted in a deprivation or infringement of that interest, and that the plaintiff did not receive the process he was due." *Royer v. Fed. Bureau of Prisons*, 933 F. Supp. 2d 170, 188 (D.D.C. 2013).

127.    Though Mr. Hall may be "under a death sentence," he "remains a living person and consequently has an interest in his life." *Woodard*, 523 U.S. at 288.  Mr. Hall's substantive interest in his life survives until his execution.

128.    Defendants' hurried efforts to execute Mr. Hall during the COVID-19 pandemic threaten to deprive Mr. Hall of his life, to which he retains a legitimate claim.

129.    Mr. Hall's counsel have been unable to investigate and prepare an adequate clemency petition that comports with professional standards because of the ongoing COVID-19 pandemic.  His attorneys' efforts to build an effective case for clemency have been made impossible by the COVID-19 pandemic, which has been raging throughout the country since Mr. Hall learned that his execution date was set.

130.    Mr. Hall has thus not been afforded meaningful access to the "fail safe" that is the clemency process.  *See Harbison*, 556 U.S. at 192 (internal citations omitted).

131.    Once the COVID-19 pandemic has been brought under control and counsel can safely undertake their work in assembling a clemency petition, Mr. Hall will have the opportunity to "be heard at a meaningful time and in a meaningful manner," without imposing undue burden on the government.

132.    Executing Mr. Hall without permitting meaningful access to the clemency process would constitute a violation of the "minimal due process" in place to protect against unconstitutional deprivation of his life.

133.    The Court should delay Mr. Hall's execution until a time when counsel can safely and effectively pursue clemency and ensure that Mr. Hall is not deprived of his life without even minimal due process in clemency.

## Count II
### (Fifth Amendment Violation – Denial of Due Process)

134.    Mr. Hall hereby incorporates by reference all allegations of the preceding paragraphs as if fully set forth herein.

135.    The BOP's shortened notice period amounts to a violation of his constitutional rights under the Fifth Amendment because it effectively deprives him of meaningful access to the clemency process.

136.    The "minimal application" of the Due Process clause applicable to clemency proceedings, recognized by the Supreme Court in *Woodard*, "ensures a death row prisoner that he or she will receive the clemency procedures explicitly set forth by state law" and that the procedure not be "wholly arbitrary, capricious or based upon whim." *Duvall v. Keating*, 162 F.3d 1058, 1061 (10th Cir. 1998).

137.    The regulations governing executive clemency provide that clemency petitions "should be filed no later than 30 days after the petitioner has received notification from the Bureau of Prisons of the scheduled date of execution." 28 C.F.R. § 1.10(b). Petitioners then have an additional 15 days to file papers in support of the petition, meaning petitioners have a 45-day period following receipt of an execution date to complete their clemency petition. *Id.*

138.    As part of seeking clemency, clemency counsel may also "request to make an oral presentation of reasonable duration to the Office of the Pardon Attorney in support of the clemency petition." 28 C.F.R. § 1.10(c).

139.    The final rule promulgating 28 C.F.R. § 1.10(b) notes that the "deadlines for filing the commutation petition and supplemental papers are intended to preserve an appropriate amount of time to process and consider a clemency request."   Rules Governing Petitions for Executive Clemency: Capital Cases, 65 FR 48379-02, 48380 (Aug. 8, 2000).   The rule further notes that "an execution date set by the Bureau of Prisons . . . will normally provide at least 120 days' notice of the date of execution."   *Id.*

140.    Mr. Hall, however, received only 50 days' notice of his execution date.

141.    Were Mr. Hall positioned to complete and submit a clemency petition, the Office of Pardon Attorney ("OPA") would have only five days to receive an oral presentation from counsel, review and consider Mr. Hall's application, and make a recommendation prior to his execution.

142.    The OPA's response to Mr. Hall's letter dated October 30, 2020 makes it clear that Mr. Hall will not receive any meaningful process from the OPA.   The OPA's automated response explains that it can take "1-3 months for newly received (within the past 90 days) clemency cases to be accepted for review and added to our system as 'pending'."   Ex. 11, at 2. Though on November 2, 2020 the OPA indicated willingness to receive supplemental materials in support of a clemency petition until November 14, 2020, and conduct a telephonic hearing during the week of November 2, such process would only provide a handful of days for preparation in advance of such a hearing, and further provide the OPA only five days to consider the supplemental evidence provided.   This is not the "appropriate amount of time to process and consider a clemency request" that the clemency process is structured to provide.

143.     The unfairly abbreviated period of notice deprives Mr. Hall of the process afforded to him under federal regulations and actively interferes with the system established for seeking clemency from the federal government.

## Count III
### (Violation of 18 U.S.C. § 3599 – Access to Counsel)

144.     Mr. Hall hereby incorporates by reference all allegations of the preceding paragraphs as if fully set forth herein.

145.     18 U.S.C. § 3599(e) provides Mr. Hall with a statutory right to counsel in connection with his pursuit of legal remedies both in federal courts and in executive clemency proceedings.  Clemency fills an essential role, acting as a "'fail safe' in our criminal justice system," *Harbison*, 556 U.S. at 192 (internal citations omitted), and the Supreme Court has noted that it is "entirely plausible" that § 3599 was passed into law in order to ensure that those on death row are not "abandoned by their counsel at the last moment and left to navigate the sometimes labyrinthine clemency process from their jail cells."  *Harbison*, 556 U.S. at 194 (quoting *Hain v. Mullin,* 436 F.3d 1168, 1175 (10th Cir. 2006) (en banc)).

146.     On September 30, 2020, Defendants notified Mr. Hall that they had scheduled his execution for November 19, 2020.  The government's notice triggered a 30-day deadline to file Mr. Hall's clemency petition and an additional 15-day period in which to file any supporting evidence.  28 C.F.R. § 1.10(b).

147.     Section 3599 requires that counsel appointed thereunder "represent the defendant [in] . . . proceedings for executive or other clemency as may be available to the defendant."  18 U.S.C. § 3599(e).  Ms. Widder and Mr. Owen serve as Mr. Hall's court-appointed counsel for clemency proceedings.  The COVID-19 pandemic has prevented counsel from fulfilling their statutory mandate to represent Mr. Hall in connection with his clemency proceedings.

148.    The COVID-19 pandemic has continuously deprived Mr. Hall of access to, and assistance from, his counsel since his execution date was set on September 30, 2020.  Mr. Hall's counsel have been unable to safely travel to meet in person with him or with other witnesses, or conduct other investigative activities as would be expected under normal circumstances.  Indeed, Ms. Widder has not conducted any in-person investigation since the pandemic began and is not permitted to travel by airplane for work until further notice.  *See* Widder Decl. ¶ 11.

149.    Both of Mr. Hall's long-time attorneys have underlying health conditions, with one having suffered from a severe bout of tuberculosis, which put them at high risk for serious illness due to COVID-19.  Furthermore, Ms. Widder lives in a small house with her 12-year-old daughter, for whom Ms. Widder is the sole caretaker and who is also at high risk given her existing health conditions—there is no possibility of an effective quarantine in light of these circumstances.

150.    The accelerating spread of COVID-19 in much of the country throughout the month of October and into November has amplified the risks to Mr. Hall's attorneys and their families. Illustrating this trend, the United States hit its highest daily number of coronavirus cases since the pandemic began on October 30, recording at least 99,000 new infections. Furthermore, COVID-19 hospitalizations have increased in 38 states, the number of daily deaths nationally has crested above 1,000, and 24 states have broken their records for single-day highs of cases—all during the month of October.  *See* William Wan & Jacqueline Dupree, *U.S. Hits Highest Daily Number of Coronavirus Cases Since Pandemic Began*, Wash. Post (Oct. 23, 2020), *available at:* https://www.washingtonpost.com/health/2020/10/23/covid-us-spike-cases.

151.    But for the pandemic, counsel would have pursued in-person interviews with numerous witnesses, including the three co-defendants who testified against Mr. Hall at trial in

exchange for favorable treatment from the government and who, at the time of Mr. Hall's initial habeas proceedings, were still incarcerated for their roles in the crimes and unlikely to be forthcoming.   Mr. Hall's counsel had planned to gather evidence regarding Mr. Hall's background and character, exemplary conduct while incarcerated, evidence refuting an alleged scheme to escape prison prior to trial, and his culpability relative to his co-defendants. Counsel also anticipated preparing a video presentation in support of clemency.

152.    Thus as he faces execution on November 19, Mr. Hall has been deprived of his constitutionally and statutorily guaranteed right to the effective assistance of counsel.  While he has counsel in theory, those attorneys have been unable to represent him in the manner required by prevailing professional norms for death penalty representation as reflected in relevant professional guidelines and standards. Mr. Hall has thus had counsel in name only, as circumstances have prevented them from providing him the services to which he is entitled under law because the threats caused by the COVID-19 pandemic have increased during this stage of the proceedings.   Mr. Hall has been altogether denied his right to have his attorneys seek clemency "in as timely and persuasive a manner as possible," ABA Guideline 10.15.2.

153.    COVID-19 has thwarted Mr. Hall's counsel from seeking clemency on the timeline imposed by Mr. Hall's impending execution date, and thus relegated him to the status of those "left to navigate the sometimes labyrinthine clemency process from their jail cells" that § 3599 attempts to avoid.  *Harbison*, 556 U.S. at 194 (quoting *Hain,* 436 F.3d at 1175).  It is likewise preventing his attorneys from determining whether facts presently exist that would support further post-conviction litigation.

154.    Allowing Mr. Hall's November 19, 2020 execution to proceed would constitute a violation of Mr. Hall's right to counsel under 18 U.S.C. § 3599.

## Count IV
### (Fifth Amendment Violation – Inadequate Notice)

155.    Plaintiff hereby incorporates by reference all allegations of the preceding paragraphs as if fully set forth herein.

156.    "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews*, 424 U.S. at 332.

157.    Statutes can "create liberty interests that are entitled to the procedural protections of the Due Process Clause." *Vitek v. Jones*, 445 U.S. 480, 488 (1980). "Once a State has granted prisoners a liberty interest," certain minimum "due process protections are necessary 'to insure that the state-created right is not arbitrarily abrogated.'" *Id.* at 488-89 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974)).

158.    The 1993 Execution Protocol and subsequent versions through 2019 created a protected liberty interest in a 90-day notice period, which Defendants have arbitrarily taken from Mr. Hall without due process of law.

159.    The time between Defendants' announcement of Mr. Hall's execution date and his scheduled date of death, the shortest in the modern history of the federal death penalty, is insufficient to guarantee that Mr. Hall and his counsel are given adequate notice of the new execution date.

160.    Moreover, the announcement of an execution date itself is not adequate or meaningful notice.  To satisfy due process, notice must also afford Mr. Hall and his counsel adequate time to prepare a meaningful clemency petition and pursue available legal remedies.

161.    The July 31, 2020 addendum, shortening the notice period to 50 days, at the warden's discretion, is a departure from the BOP's longstanding notice provisions for an execution and violates Mr. Hall's rights under the Fifth Amendment.

## Count V
### (*Ex Post Facto* Clause Violation)

162.    Plaintiff hereby incorporates by reference all allegations of the preceding paragraphs as if fully set forth herein.

163.    The U.S. Constitution provides that "[n]o bill of attainder or ex post facto Law shall be passed" by Congress. U.S. Const., art. I, § 9, cl. 3.

164.    The prohibition on *ex post facto* laws is not limited to legislative enactments.  It also "can include changes to regulations and even guidelines . . .". *Bailey v. Fulwood*, 793 F.3d 127, 134 (D.C. Cir. 2015).

165.    When regulations or guidelines changing the punishment of a criminal defendant "[o]n their face" are "substantially different" from earlier regulations or guidelines, that divergence can violate the *Ex Post Facto* Clause. *Fletcher v. Reilly*, 433 F.3d 867, 877–78 (D.C. Cir. 2006).

166.    "The Constitution forbids the passage of ex post facto laws, a category that includes '[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.'" *Peugh v. United States*, 569 U.S. 530, 532–33 (2013) (quoting *Calder v. Bull*, 3 U.S. 386 (1798)).

167.    The BOP's changed notice policy in fact imposes greater punishment and works to Mr. Hall's substantial disadvantage by both shortening his life and significantly curtailing the time available to his attorneys to assemble a clemency petition and other judicial avenues of relief.

168.   "Just a few more days of life is of inestimable value to a man who is to be executed." *In re Petition of Ellisor*, 140 F. Supp. 720, 727 (S.D. Tex. 1956), *aff'd Ellis v. Ellisor*, 239 F.2d 175 (5th Cir. 1956).  A change in law or policy that diminishes the period of time a condemned prisoner has to live accordingly works to his detriment and has *ex post facto* consequences.  As the Supreme Court explained over a century ago, a "shortening of the time of confinement, whether in the county jail or in the penitentiary, before execution, . . . undoubtedly . . . would have increased, the punishment to the disadvantage of a criminal sentenced to be [executed]" in violation of the *Ex Post Facto* Clause. *Rooney v. North Dakota*, 196 U.S. 319, 325 (1905).

169.   Mr. Hall's life will be shortened by a minimum of 40 days as a result of Defendants' reducing the notice period from ninety days to fifty.  If retroactively applying a rule that would take even a single day from a convict's life would have *ex post facto* implications, there can be no question that losing 40-plus days of life substantially increases Mr. Hall's punishment.

170.   Moreover, foreshortening Mr. Hall's life has undermined his attorneys' ability to conduct the necessary work at this stage of litigation.  Whereas the defense teams of prior inmates given 90-plus days' notice could focus their attention initially on clemency applications (by regulation due 30 days after the date of the notice, *see* 28 C.F.R. § 1.10(b)), before having to turn to the myriad other duties of counsel at end-stage proceedings, Mr. Hall has been deprived of that opportunity for no legitimate reason.

171.   Prior law afforded Mr. Hall sufficient time "in which to prepare for his departure from all earthly scenes," *Gore v. Humphries*, 135 S.E. 481, 484 (Ga. 1926), and for his counsel to conduct appropriate and necessary investigation and research to assess further judicial avenues

of relief and to file an appropriately compelling petition for executive clemency. Retroactively applying the government's new, dramatically curtailed notice provision has deprived Mr. Hall of substantial benefits and, as a result, imposes greater punishment in violation of the *Ex Post Facto* Clause. The government accordingly must be prohibited from executing Mr. Hall without first complying with the appropriate notice requirements.

<u>Count VI</u>
**(Violation of APA — *Ultra Vires* Agency Action Contrary to the FDPA and U.S. Constitution)**

172.    Plaintiff hereby incorporates by reference all allegations of the preceding paragraphs as if fully set forth herein.

173.    Under the APA, a reviewing court must set aside agency action that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "contrary to constitutional right, power, privilege or immunity." 5 U.S.C. § 706(2)(A)-(C).

174.    The Take Care Clause of the U.S. Constitution imposes a duty on the Executive Branch to "take Care that the Laws be faithfully executed." U.S. Const., art. II, § 3. The Take Care Clause forbids the Executive Branch from making acts of Congress unlawful by refusing to enforce them as written. The Take Care Clause preserves the principles of separation of powers inherent in the U.S. Constitution by preventing the Executive Branch from arrogating to itself the legislative power to revoke or rewrite laws.

175.    An agency's rule is also arbitrary and capricious when, among other circumstances, the agency has "entirely failed to consider an important aspect of the problem." *Motor Veh. Mfrs. Ass'n v. State Farm Ins.*, 463 U.S. 29, 43 (1983).

176.    The 2019 Protocol violates the FDPA. The 2019 Protocol flouts the statutory command established by 18 U.S.C. § 3596(a), which provides that "a United States marshal[ ]

shall supervise implementation of the sentence."  Instead, the 2019 Protocol reassigns that responsibility to the Director of the BOP.  The United States Marshals Service had no meaningful role in the preparation of the 2019 Protocol and its role in federal executions is limited to identifying impediments, such as pardons and stays and giving the approval to begin the execution.  Ex. 2 at AR 1105, 1109.

177.    Federal law prohibits the responsibilities Congress expressly delegated to the Marshals Service from being reassigned to the Bureau of Prisons.  The FDPA specifically instructs the Attorney General to "release" the prisoner to a Marshal's custody for execution, 18 U.S.C. § 3596(a), not the BOP.

178.    Accordingly, the 2019 Protocol should be held unlawful and set aside pursuant to the APA, 5 U.S.C. § 706(2).

**Count VII**
**(Fifth Amendment Violation – Denial of Equal Protection)**

179.    Plaintiff hereby incorporates by reference all allegations of the preceding paragraphs as if fully set forth herein.

180.    Amid the COVID-19 pandemic and without explanation, Defendants elected to dramatically shorten the time period required to notify death-sentenced prisoners of their scheduled execution dates.  In so doing, Defendants arbitrarily abridged the process by which Mr. Hall's petition for clemency may be evaluated.  Such a process unfairly affords the protections of process to some but not others—namely, affording significantly more process to those scheduled for execution prior to the COVID-19 pandemic than those scheduled for execution during the COVID-19 pandemic—and therefore violates the Fifth Amendment's equal protection guarantee.

181.    By scheduling Mr. Hall's execution on such a short timeline, in the midst of a pandemic, Defendants have deprived Mr. Hall of the process historically afforded to death row prisoners to pursue clemency.  The government's arbitrary issuance of a new notice rule, which departs from a nearly thirty-year-old protocol requiring at least 90 days of notice, and rigid adherence to that newly minted rule despite an ongoing and accelerating unprecedented global health crisis denies Mr. Hall equal protection under the laws.  There is no rational basis for shortening the notice provisions, let alone amid the COVID-19 pandemic.

182.    The Fifth Amendment's guarantee of equal protection is violated where "discrimination reflects no policy, but simply arbitrary and capricious action."  *Baker v. Carr*, 369 U.S. 186, 226 (1962).

183.    Denial of adequate process, applied unevenly, has been recognized as a cognizable claim under the Fifth Amendment.  *See, e.g.*, *Schnitzler v. United States*, 761 F.3d 33 (D.C. Cir. 2014); *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098 (D.C. Cir. 2005); *see also Durso v. Rowe*, 579 F.2d 1365 (7th Cir. 1978); *accord Brandon v. Dist. of Columbia Bd. of Parole*, 734 F.2d 56, 60 (D.C. Cir. 1984).

184.    Mr. Hall has been denied equal protection under the Fifth Amendment as he has not received the same process that other death row prisoners have been afforded to pursue clemency.  The circumstances presented by the COVID-19 pandemic have not only prevented counsel from conducting the investigation needed to develop a factual record supporting clemency, but also functionally guarantee inadequate time for review by OPA and the President.  Defendants' arbitrary decision to shorten the typical amount of time within which individuals on federal death row may pursue clemency petitions imposes an unequal effect on Mr. Hall that violates his right to equal protection under the law.  Indeed, Defendants' decision to shorten the

time period comes at a time when legal proceedings have otherwise routinely been lengthened to account for hardships posed by the pandemic.  *See, e.g.*, Miscellaneous Order dated March 19, 2020 (extending the period to seek certiorari from 120 days to 150 days "[i]n light of the ongoing public health concerns relating to COVID-19"), *available at*: https://www.supremecourt.gov/orders/courtorders/031920zr_d1o3.pdf.

185.    Since at least 2001, federal prisoners on death row have received between 120 and 173 days of notice of their scheduled executions. On July 25, 2019, BOP noticed the executions of five prisoners, providing between 137 and 173 days' notice.  Press Release 19-807, Federal Government to Resume Capital Punishment after Nearly Two Decade Lapse, U.S. Dep't of Justice (July 25, 2019), https://www.justice.gov/opa/pr/federal-government-resume-capital-punishment-after-nearly-two-decade-lapse.  These individuals were not at that time hamstrung by pandemic-related restrictions, but were nonetheless granted more time to complete the work needed, and the President had more time to review the petitions.

186.    The inadequate process offered to Mr. Hall is the result of Defendants' unilateral decisions to shorten the notice period and to push forward with Mr. Hall's execution despite this unprecedented global health crisis.  Both decisions are arbitrary and, given the circumstances, wholly unreasonable.

187.    As a result, Mr. Hall has substantially less time, and significantly greater hurdles, than other similarly-situated individuals to pursue clemency and to allow the President to fully consider his petition.

188.    Defendants' actions have denied Mr. Hall equal access to the clemency process and prevented him from availing himself of the same procedures afforded other similarly-situated individuals.

**Prayer for Relief**

WHEREFORE, in order to prevent the violations of Mr. Hall's rights under the Art. 1, § 9, cl. 3, Art. II, § 3, the Fifth and Sixth Amendments to the U.S. Constitution, and the FDPA alleged above, Mr. Hall's respectfully request that the Court enter the following relief:

a. a temporary restraining order and a preliminary and permanent injunction preventing Defendants from executing Mr. Hall until this Court determines that the COVID-19 pandemic no longer prevents his attorneys from consulting with Mr. Hall, interviewing witnesses, and conducting other investigations in person and without undue risk to the health and safety of the attorneys, their family members, and others with whom they interact for purposes of the clemency process;

b. an order declaring that Mr. Hall's execution violates his rights under Art. I, § 9 cl. 3, Art. II, § 3 and the Fifth and Sixth Amendments to the U.S. Constitution;

c. an order that BOP's notice provisions, as applied to Mr. Hall's circumstances, are deficient;

d. an order declaring that Mr. Hall's execution violates the FDPA; and

e. any such other equitable relief as this Court deems just and proper, including grant of Mr. Hall's concurrently filed motion for a temporary restraining order and preliminary injunction.

Dated:  November 3, 2020                      Respectfully submitted,

                                    By:     */s/  Kaitlyn A. Golden*
                                            Kaitlyn A. Golden (DC Bar No. 1034214)
                                            Kathryn M. Ali (DC Bar No. 994633)
                                            David S. Victorson (DC Bar No. 1027025)
                                            HOGAN LOVELLS US LLP
                                            555 Thirteenth Street, N.W.
                                            Washington, D.C. 20004
                                            Telephone: (202) 637-5600

Facsimile: (202) 637-5910
kathryn.ali@hoganlovells.com
kaitlyn.golden@hoganlovells.com
david.victorson@hoganlovells.com

Pieter Van Tol (*pro hac vice* pending)
Charles Barrera Moore (*pro hac vice* pending)
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
(212) 918-3100 (fax)
pieter.vantol@hoganlovells.com
charles.moore@hoganlovells.com

Marcia A. Widder (*pro hac vice* pending)
104 Marietta Street NW, Suite 260
Atlanta, GA 30303
(404) 222-9202
(404) 301-3315 (fax)
marcy.widder@garesource.org

Robert C. Owen (*pro hac vice* pending)
Law Office of Robert C. Owen, LLC
53 West Jackson Blvd., Suite 1056
Chicago, IL 60604
(512) 577-8329
robowenlaw@gmail.com


*Counsel for Plaintiff Orlando Hall*